## CLIMATIC RAINWEAR, CO., Inc. v. UNITED STATES.

### No. 47888.

United States Court of Claims.
Feb. 6, 1950.

Paul A. Porter and Norman Diamond, Washington, D. C., for the plaintiff. Arnold, Fortas & Porter, Washington, D. C., on the brief.

Kendall M. Barnes, Washington, D. C., Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge, and HOWELL, MADDEN, WHITAKER, and LITTLETON, JJ.

HOWELL, Judge.

Plaintiff sues to recover a balance of $53,964.35 under its contract for raincoats and ponchos with defendant acting through the Philadelphia Quartermaster Depot of the War Department. This contract numbered W–36–030–qm–14952 (hereinafter referred to as Contract 14952) was entered into on April 16, 1945.

Defendant has admitted that the aforesaid sum became due plaintiff but has denied liability on two grounds: first, by virtue of an alleged release of all plaintiff's claims under Contract 14952 and second, by way of set-off against the amount in question of an equivalent sum representing excess costs and liquidated damages claimed by defendant under a prior contract between it and plaintiff for the manufacture of Army raincoats. This contract had been entered into on August 14, 1942, numbered W–669–qm–20481 (hereinafter referred to as Contract 20481).

Plaintiff by replication denies the asserted release and set-off, and alleges that the withholding and setting off of the amount in question was unauthorized and illegal.

The parties filed certain stipulations of fact, which are a part of the record, in-

cluding an agreement that the arithmetical calculation of the liquidated damages assessed under Contract 20481 was correct; thus the amount thereof is not in question— only the plaintiff's liability therefor.

We have these two fundamental questions with which to deal, first whether plaintiff released its claim for the sum of $53,964.35 which defendant admittedly owed it under Contract 14952, and secondly, whether defendant was entitled to withhold and set off against that amount an equivalent sum on account of excess costs and liquidated damages assessed against plaintiff under the other and previous Contract 20481.

### The Release

On April 11, 1945, defendant demanded payment by plaintiff of the sum of $53,964.35, the excess costs and liquidated damages assessed under Contract 20481. For reasons that will appear later on in this opinion, plaintiff did not pay this sum and defendant withheld $33,009.00 by a "no-payment" voucher of June 9, 1945, and $20,985.35 by a "partial payment" voucher of June 23, 1945, both of which bore the notation "reimbursement withheld to protect the interests of the Government because of default under Contract W-669-qm-20481."

Article 8 of Contract 14952 provided that the contractor should be paid "upon the submission of properly certified invoices or vouchers, the prices stipulated herein for articles, delivered and accepted * * *." Plaintiff made deliveries thereunder beginning on or about May 3, 1945, and it was from the sums due from such deliveries that the above sums were withheld.

Later, however, on August 14, 1945, this contract (14952) was terminated for the convenience of the Government. The termination notice provided in subparagraph 6 (Finding 5) as follows: "6. *Completed Articles.*—Completed articles which have been shipped but not received prior to the effective date of termination will be considered for all purposes as articles delivered prior to such effective date. Other completed articles accepted and delivered after the effective date of termination, in accordance with directions of the Awarding Con-

tracting Officer will be treated as articles delivered under the Contract. In both instances, they should, therefore, be invoiced in the usual way and not included in your termination claim."

On April 3, 1946, a supplemental agreement was entered into in connection with the termination. Plaintiff, in submitting its termination settlement proposals, did not include claims for finished articles under Contract 14952, payment having been sought therefor only by way of invoices in accordance with paragraph 6, supra, of the termination notice.

The defendant's defense of release is based upon this "Supplemental Agreement to Contract 14952" entered into pursuant to the Contract Settlement Act of 1944, 41 U.S.C.A. § 101 et seq., the provisions of which concerning what was released being as follows:

"Article 4 (a) * * *

"(b) Upon payment of said sum of $33,290.07 as aforesaid, all rights and liabilities of the parties under the Contract * * * shall cease forthwith and be forever released except:

* * * * * *

"6. All rights of the Contractor to payment of the contract price therefor for completed items, if any, delivered and accepted pursuant to the Contract, for which payment has not previously been made."

* * * * * *

At the very time this agreement was executed, plaintiff's claim for payment of sums withheld under Contract 14952 was pending before the Comptroller General. Several months later, on August 28, 1946, the Comptroller General denied plaintiff's claim on the ground that the debt in question had been set off against amounts assessed against plaintiff as excess costs and liquidated damages under Contract 20481 pursuant to a termination of that contract for failure to deliver and plaintiff's alleged omission to take a timely appeal therefrom.

The plaintiff says that under the express instruction of the Government as contained in paragraph 6, supra, of the termination notice, it was required to exclude all claims for completed articles from its termination

settlement proposals. Furthermore, that in accordance with such instructions, it did actually exclude such articles, and submitted invoices therefor, which became due and payable when the articles were delivered and accepted, under Article 8 of Contract 14952. Finally, that its rights to payment for completed items delivered and accepted pursuant to the contract for which payment had not previously been made were expressly reserved by Article 4, paragraph (6), supra, of the termination settlement agreement.

■ A consideration of these contentions in the light of the express language contained in the documents before us, reveals, in our opinion, that plaintiff's contentions are correct. To construe this language in such a way as to hold that plaintiff released its claim for payment of these articles would require us to disregard language which in no sense would constitute anything other than an express reservation of its rights in an unqualified manner. Certainly, the parties were competent to enter into these agreements, and their expressed intention is clear and unambiguous.

The Government contends that the plaintiff has been "previously paid" for completed items delivered and accepted pursuant to the contract under the language of Article 4 (b) (6) of the termination settlement agreement by reason of the "set-off" made by the Comptroller General in withholding payments for completed items due under Contract 14952 for excess costs and liquidated damages due the Government as a result of the cancellation of Contract 20481.

■ In effect, the Comptroller General applied amounts standing to the credit of plaintiff on the books of the United States against an amount believed by the Comptroller General to be the amount of damages for which it was claimed plaintiff was liable to the defendant. Such action could not possibly constitute a *prima facie* case in favor of the defendant, either on questions of law or of fact. A disputed claim for damages, for breach of contract, cannot in any sense of the word be considered a stated account and such claim is not subject to the control and decision of the accounting officers of the United States. As stated in Standard Dredging Co. v. United States, 71 Ct.Cl. 218, 240: " * * * The reason is plain. Such claims must be sustained by extraneous proof and often involve a broad field of investigation requiring the determination of difficult legal questions and the application of judgment and discretion upon the measurement of damages and the weight of conflicting evidence. * * * "

■ Accordingly, it cannot be said that by any such medium can a "payment" in favor of plaintiff be accorded. The power to withhold accords the Government advantage enough in disputes with those with whom it deals without converting the weapon into a device for expropriation. See Standard Surety & Casualty Co. v. United States, 10 Cir., 154 F.2d 335, 337, 164 A.L.R. 935. This account was in dispute between the parties and being thus unsettled, it could not equitably be used to apply against a sum due and owing to the plaintiff under the terms of Contract 14952 and the reservations made under the termination settlement agreement.

The Government's defense of release is, therefore, overruled.

### The Set-Off Under Contract 20481

Plaintiff had originally entered the raincoat business as a result of the efforts of the B. F. Goodrich Rubber Company to find a subcontractor in the New York area willing to contract for the production of synthetic rubber raincoats made from a resin coated fabric known as Koroseal. The facts and circumstances leading up to the acceptance of the subcontract from Goodrich, as well as the prime contract numbered 20481 from the Government, are detailed in our Finding of Fact Nos. 9–11.

With the approval of the Philadelphia Quartermaster Depot, Goodrich concluded negotiations with plaintiff and on or about July 3, 1942, entered into a subcontract with it for 300,906 "double-needle seam-strapped" coats. This subcontract carried a preference rating of "A–1–i" and provided for the delivery of 1,600 coats by

July 11, 1942, with increasingly larger weekly deliveries thereafter, and final delivery by September 26, 1942.

On July 13, plaintiff, after it had received the subcontract, submitted a bid for 300,000 coats under an invitation of the Philadelphia Quartermaster Depot, issued under Specification 71C. The bid designated the same "double-needle seam-strapped" construction and called for deliveries to begin October 16, 1942. The bid was accompanied by a sample coat made by the specified method and a letter advising defendant that plaintiff was a newly formed corporation holding a subcontract from the B. F. Goodrich Company for the manufacture of 300,000 synthetic resin coated raincoats and further that plaintiff was depending upon Goodrich to supply coating fabric and strapping materials.

On August 4, 1942, the Philadelphia Quartermaster Depot awarded plaintiff Contract 20481 for 100,000 raincoats. The "Letter of Award" specified a preference rating of "A–1–i," the same previously given to its Goodrich subcontract, and a delivery schedule calling for 10,000 coats by October 16, 1942, and 30,000 weekly thereafter. The Depot by letter of August 6, 1942, requested plaintiff to submit samples of component parts of the coats which asked, among other things, for "strapping" not described by the specifications for Class A noncemented coats. Later by telegram of August 15, 1942, the Depot directed plaintiff to accelerate deliveries by using overtime and extra shifts. Plaintiff, on August 18, 1942, replied by wire that it could accelerate production to 10,000 units per day at an estimated cost to the Government of 34 cents a unit. Plaintiff confirmed this advice by letter of August 27, 1942, and on September 15, 1942, the Depot sent plaintiff a supplemental agreement providing for such acceleration.

The contracting officer under Contract 20481 was Ely R. Callaway, 1st Lieutenant (later Captain) QMC. Article 23, *Definitions,* and Article 26, *Delays—Liquidated Damages,* are set out in Finding 12.

Plaintiff began deliveries under its Goodrich subcontract on August 14, 1942, using materials supplied by Goodrich. After 2,500 coats had been delivered and with 20,000 more in production, the Philadelphia Quartermaster Depot advised plaintiff that a large percentage of coats had been rejected due to leakage in the seams.

Finding 15 sets out in detail the manner in which the coats were tested and the combined efforts of the Depot, representatives of Goodrich and plaintiff, to overcome the problem of leakage. From our findings, it is apparent that the difficulty was due in no way to any fault upon the part of the plaintiff. There was never any intimation that they were any defects in the actual construction of the coats, the sole difficulty being attributed to the strapping applied around the seams. It was only when Goodrich discovered a new brushing compound that the difficulty was overcome, and then plaintiff was able to produce a satisfactory coat conforming to the Class A method of specifications. It is to be noted that the various changes in methods of strapping the coats were made from time to time but always with the approval of the Depot. The testimony revealed that for some unexplained reason the early material used for strapping disintegrated in some way causing the leaks. Neither the Goodrich Company nor the Quartermaster Depot could offer any satisfactory explanation for this weakness, but certainly it cannot be attributed in any way to plaintiff who depended upon Goodrich, with the knowledge and approval of the Depot, for strapping materials.

Plaintiff went into production and began deliveries on August 14, 1942, and thereafter was subject to recurring shut-downs while efforts were made to overcome the leakage problem. Had these interruptions not occurred, we believe that plaintiff would have been able to deliver the quantities of coats called for under its subcontract on schedule. However, as it was, deliveries were delayed until early December 1942 when they were resumed. By April 1943, deliveries were completed, the subcontract having been reduced in the meantime by a change order to 250,000 coats. It must be emphasized at this point that while plaintiff was obligated under this subcontract to complete deliveries by September 26, 1942,

Goodrich was not assessed any liquidated damages for delay in the delivery of these coats completed some six months later. (See finding 10.)

Since the Goodrich subcontract called for prior delivery dates, plaintiff requested a 120-day extension of time to complete performance under its prime contract 20481, by letter of October 2, 1942. The letter gave two principal causes of delay described as "absolutely unforeseeable." The first was the rejection by the Philadelphia Quartermaster Depot of the coats for the reasons described above, which forced a drastic curtailment of plaintiff's operations during the entire period required by the further experimentations. The second was the loss of time, suffered at plaintiff's auxiliary factory due to a fire, and the forced vacation of that plant which was taken over by the Navy. The letter also called attention to the fact that plaintiff was obligated to complete the Goodrich subcontract before proceeding on the prime contract.

On October 22, 1942, the Quartermaster Depot requested detailed information with respect to the two claimed causes of delay, to which plaintiff responded by letter of October 31, 1942 (finding 17). Plaintiff explained in general the cause of delay more fully in its letter of November 11, 1942, and concluded by saying that it could not determine the delay that had been caused for the reason that the method of construction had not been finally determined. This latter statement is fully borne out by the facts above detailed to the effect that deliveries under the Goodrich subcontract were not resumed until December 3, 1942.

On November 16, 1942, the Quartermaster Depot acknowledged this letter and stated among other things: " * * * You are advised that a determination relative to your request will be held in abeyance pending the receipt of the additional information referred to in your afore-mentioned letter."

Four days later, on November 20, 1942, while the Depot had before it plaintiff's request, the following letter signed by Captain E. R. Callaway as contracting officer was sent to plaintiff:

"Reference is had to Letter of Award dated August 4, 1942, contract W669–qm–20481 for 100,000 Raincoats, Synthetic, Resin Coated, O. D., Dismounted.

"Due to your failure and inability to make delivery in conformance with your contract requirements, you are informed that under the terms and conditions of Article 26 of the contract, your right to deliver the entire quantity of Raincoats, Synthetic, Resin Coated O. D., Dismounted, is hereby terminated.

"Purchase of the above quantity is being made under Article 26 of the contract. Any excess cost occasioned the Government thereby will be charged against your account."

██ Although designated as contracting officer, it appears from the evidence Capt. Callaway has nothing to do with this decision to terminate this contract, but merely signed the letter at the request of Capt. A. B. Rawn, Jr., who determined upon the action as a result of a program to overcome maladjustments in raincoat procurement which had resulted in a delinquency of deliveries of over 2,000,000 raincoats from all contractors (Finding 20).[1]

No one other than Capt. E. R. Callaway had been designated in Contract 20481 as the Contracting Officer (Finding 12).

Contract 14952, on the other hand, contained entirely different language on this point, wherein "Contracting officer" was defined to "include any and all Contracting Officers, acting within the scope of the orders appointing them Contracting Officers

---

1. The Government has excepted to this entire finding on the ground that it is not based upon any competent proof in the record. The proof consisted of sworn testimony given by Lt. Rawn before the Board of Contract Appeals, introduced through the witness Newmark who was present at that hearing and the one in this case. In our opinion the statements of fact are material and relevant to the issues before us and such testimony was properly received as admissions by defendant.

and their duly appointed successors or representatives."

Article 26 of Contract 20481 concerning liquidated damages provided that in the event of failure to deliver on time, the right to perform might be terminated and, further, that the contractor might also be held both for excess costs of securing replacements and for liquidated damages. Next, there is a proviso that "the contractor shall not be charged with liquidated damages or any excess cost when the delay in delivery is due to unforeseeable causes beyond the control and without the fault of the contractor. * * * if, within 10 days from the beginning of the delay, written notice of the cause therefor was given to the contracting officer." The concluding proviso of the article enjoined the "contracting officer" upon receipt of such a notice to "ascertain the facts and extent of the delay" and authorized him to extend the time for delivery if justified by his "findings of fact," which were designated as "final and conclusive," subject only to appeal within 30 days to the "Secretary of War or his authorized representative."

■■ It is a familiar doctrine that provisions for liquidated damages should be narrowly construed Tobin v. United States, 103 Ct.Cl. 480, 492, 59 F.Supp. 410. Under the provisions of Article 26 it was made mandatory upon the contracting officer to make findings of fact upon an application for an extension. Manufacturers Casualty Insurance Co. v. United States, 105 Ct.Cl. 342, 63 F.Supp. 759; Universal Power Corporation v. United States, 112 Ct.Cl. 97, 122.

Under the terms of Contract 20481, it became the duty of E. R. Callaway, Jr., as the named contracting officer, to not only give his personal and independent consideration to the termination of plaintiff's right to deliver under Article 26, but also to make findings of fact concerning the circumstances and extent of the delay, upon timely written notice from plaintiff of the reason therefor.

The discharging of these functions could neither be delegated to nor usurped by anyone not authorized by the terms of the contract. King v. United States, 37 Ct.Cl. 428, 436; Standard Dredging Co. v. United States, 71 Ct.Cl. 218, 246-249; Phoenix Bridge Co. v. United States, 85 Ct.Cl. 603, 629; Zweig Co. v. United States, 92 Ct.Cl. 472, 482; Hirsch v. United States, 94 Ct.Cl. 602, 634; John McShain, Inc., v. United States, 106 Ct.Cl. 280, 348-351.

■ Therefore, the letter of November 20, 1942, supra, over Capt. Callaway's signature did not meet the requirements of Article 26 of Contract 20481 upon two very material grounds. In the first place, it did not represent Capt. Callaway's personal and independent consideration as disclosed by the record before us and especially Capt. Rawn's testimony that he personally terminated the contract and that Capt. Callaway "signed that letter at my request." (Finding 20.)

"For the weight ascribed by the law to the findings—their conclusiveness when made within the sphere of the authority conferred—rests upon the assumption that the officer who makes the findings has addressed himself to the evidence, and upon that evidence has conscientiously reached the conclusions which he deems to justify. * * * The one who decides must hear." Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288.

In the second place, the letter does not recite any findings of fact but merely recites the termination of plaintiff's right to deliver because of "its failure and inability" to do so on schedule. Plaintiff's failure to deliver on time is the very contingency provided for in Article 26 requiring findings of fact. The findings of fact are certainly not to be directed towards the question of whether there has been a delay, which is admitted, but to the causes for the delay and the extent and foreseeability thereof.

The question is not one of an absence of elaboration or of a suitably complete statement of the grounds for the contracting officer's decision, but the utter lack of basic findings required to support it. State of Florida v. United States, 282 U.S. 194, 214-215, 51 S.Ct. 119, 75 L.Ed. 291.

For these reasons, then, the letter of November 20, 1942, was not such a deter-

mination or findings of fact from which an appeal was required within 30 days.

Shortly thereafter, on November 30, 1942, the Quartermaster Depot advised plaintiff that contracts had been let for the quantity of raincoats covered by its Contract 20481 at an additional cost of $2,200 to the Government (Finding 21), and called for an early remittance of that amount. There was also the intimation that other costs might have been sustained by the Government and upon a determination of "any such costs" further remittance would be required.

In December 1942 plaintiff received word that there was a possibility that liquidated damages might be assessed against it, whereupon plaintiff protested against such imposition by letter of December 29, 1942 (Finding 22).

Defendant responded by sending a copy of its previous letter of October 22, 1942, and stated: " * * * Until a reply to the inclosed questionnaire has been received, this Depot can take no further action."

In other words, the definite indication was that plaintiff's application for an extension of time for delivery was still under consideration.

On January 7, 1943, plaintiff advised the Quartermaster Depot in further reply to the questionnaire of October 2, 1942, that in view of the termination of Contract 20481 it would rest its claim against the assessment of liquidated damages on the sole ground of the construction difficulties encountered under its subcontract with the Goodrich Company. Further, that it was still delivering coats under the subcontract and had delivered approximately 100,000 up to that time.

Under date of January 15, 1943, findings of fact under Article 26 of the contract were sent plaintiff by the contracting officer. The findings are set out in full in our Finding 24, and from them it is evident that at least they were intended to be "findings of fact" under Article 26 of the contract.

An analysis of the findings discloses that the reason for the refusal to grant the requested extension of time was "the contractor's election to fulfill its obligation to furnish and deliver 300,906 raincoats under its Goodrich subcontract (W 669–qm–17061)."

Upon receipt of such findings, plaintiff's representative Newmark visited the Quartermaster Depot and advised Capt. Rawn, who signed the findings as Contracting Officer, that plaintiff disagreed with the findings and desired to appeal from them. Rawn, in turn, advised Newmark that he had relied on the legal department for advice and presented a Capt. Godfrey who had prepared the findings for Capt. Rawn (Finding 25).

Plaintiff called attention of Capt. Godfrey to Section 944.7 of Priorities Regulation No. 1 originally issued by the O.P.M., the predecessor of W.P.B., on August 27, 1941. Although amended from time to time, this section provided in effect that rated orders were to be filled in preference to nonrated orders, that orders bearing higher priority ratings were to be filled in preference to orders bearing lower ratings, and that, in the case of orders bearing identical priority ratings, the one to which rating was first applied should be the first one filled.

The evidence shows that Capt. Godfrey said he knew nothing of the regulation and that in view of its portent it would have a bearing upon the subject if a reconsideration could be obtained from the Quartermaster Office. In discussing the question of whether an appeal should be taken or a reconsideration asked, Godfrey told plaintiff that a reconsideration might render an appeal unnecessary.

Plaintiff did ask for a reconsideration by letter of January 25, 1943, calling defendant's attention to Priorities Regulation No. 1, repeating its reason for failure to deliver and asking that, pending the reconsideration of the matter, an extension of time be granted for appeal from the decision of January 15, 1943.

Thus plaintiff was caught in the whipsaw. It could prosecute its appeal within 30 days as it had been admonished to do in the letter of January 15, 1943, containing the findings of fact—signed by Capt. Rawn

upon advice given by Capt. Godfrey—or it could request a reconsideration—as suggested by Capt. Godfrey and risk the forfeiture of its right of appeal.

Under the circumstances, plaintiff did what might have been expected of the average American company doing business with an agency of the War Department during a period of extreme emergency. It relied upon Capt. Godfrey's suggestion that a request for reconsideration might render an appeal unnecessary and at the same time preserved insofar as possible its right to appeal should an appeal become necessary.

Under date of February 24, 1943, defendant acknowledged the plaintiff's letter of January 25, 1943, and stated that the request for waiver of assessment of liquidated damages was under consideration.

The next thing plaintiff heard from defendant was an offer to enter into a supplemental agreement to Contract 20481 (which had been terminated by defendant's letter of November 20, 1942, supra) to "compensate you for approximately 75% of the delays encountered by January 15, 1943" and at the same time admonishing plaintiff that the offer should not be construed as a determination that the delays in deliveries under the contract were excusable. This letter was signed by "Ely R. Callaway, Jr., Captain, Q.M.C., Contracting Officer."

This matter was placed before plaintiff's board of directors which requested of defendant the amount of penalties which would be imposed in connection with the revised delivery schedule. Defendant advised plaintiff by letters of April 12 and April 14, 1943, that the estimated liquidated damages would be $10,300, plus excess costs of $2,200, plus an additional undetermined amount for transportation charges. Plaintiff replied that it considered the amount of penalties unjust and offered $3,000 as a compromise "without prejudice" to its rights set forth in its letter of January 25, 1943.

There the matter rested until May 4, 1944, when plaintiff's counsel wrote and requested a speedy disposition of the question pending under Contract 20481. After an interchange of letters plaintiff was advised on September 28, 1944, by the Depot that "the claim for refund of liquidated damages" had been forwarded to "higher authority" for determination.

By letter of April 11, 1945, plaintiff was held liable for liquidated damages under Article 26 of Contract 20481 in the net sum of $53,964.35 (Finding 31). The parties have stipulated that this sum correctly measures plaintiff's liability, if any, under that contract.

Within thirty days, on May 9, 1945, plaintiff addressed a written appeal to the Board of Contract Appeals and after detailing the preceding history of Contract 20481, asked that its "appeal dated January 25, 1943" be processed for hearing and determination made thereon. Also that insofar as the letter of April 11, 1945, constituted a decision by the contracting officer, that the appeal should also apply to it.

After a hearing, the Board of Contracts Appeals, on September 28, 1945, dismissed the appeal as having been filed out of time. On plaintiff's motion for reconsideration, the Secretary of War on recommendation of the Board of Contract Appeals, affirmed the decision on October 30, 1945.

These sums having been withheld from payments due under Contract 14952 (Finding 34) above discussed, plaintiff's attorneys wrote the War Department under date of February 8, 1946, requesting payment of them. The War Department replied that it no longer had jurisdiction of the contract and referred the matter to the Comptroller General upon request of plaintiff. On August 28, 1946, the Comptroller General denied the request for payment of the moneys withheld.

A consideration of the above recitals based upon our findings of fact, discloses that plaintiff for the second time found itself the victim not only of errors of omission but of commission on the part of the defendant. It should be stated at this point that this court is aware of the fact that the Philadelphia Quartermaster Depot was a tremendous Government depot not only in size of personnel but in the amount of war material purchased and handled by it as well as the great variety of items with which it dealt. Billions of dollars were

involved in transactions with private individuals and corporations representing countless thousands of war items. Instances were bound to arise wherein someone somewhere along the line would fail to act in a manner prescribed by law or in acting might be mistaken. Furthermore, situations might arise wherein various individuals charged with definite responsibilities might in independent action bring about unlawful, inequitable or unconscionable results which might have been avoided had joint or cooperative efforts been employed.

In other words, the Government stood a good chance of "getting its wires crossed" every now and then.

This, we believe, is exactly what happened to the plaintiff in this case, not only once but twice.

■ We have previously dealt with the termination of Contract 20481 at the very time when plaintiff had every assurance that its request for extension was receiving attention. To attempt to justify such action on the part of the Government would indeed excuse it from any sense of good faith ordinarily required of it in its relations with those with whom it deals on a contractual basis. Struck Construction Co. v. United States, 96 Ct.Cl. 186.

Now we are called upon to consider the facts attending the issuance of "findings of facts" under Article 26 of the contract and the events subsequent thereto.

These findings are subject to several obvious infirmities which render them a nullity. In the first place, they completely ignore plaintiff's proof as to the causes for the delay—such delay being the basis for terminating Contract 20481. The findings, in failing to deal with this proof, attribute the delay to plaintiff's "election" to complete its Goodrich subcontract before performing its prime contract.

In the second place, Capt. Rawn was not authorized to issue the findings of fact as "contracting officer." We have dealt with this question in connection with the issuance of the termination notice, and need only to say further that Capt. Callaway, the officer named in the contract, continued to execute letters as "contracting officer" as late as March 29, 1943. He evidently was at the Depot continuously on the job during the time these events were taking place, and we can find no warrant or excuse for any delegation of authority to Capt. Rawn.

■ Assuming that Capt. Rawn did have authority to issue the findings of fact, he did not give his personal and independent consideration to them but relied on one Capt. Godfrey of the legal department to prepare them for him. The findings, therefore, must be held for naught for this further reason. Livingston v. United States, 101 Ct.Cl. 625, 639; Morgan v. United States, supra.

The most important reason for rejecting the findngs is the fact that they ran absolutely counter to the Second War Powers Act, 50 U.S.C.A.Appendix, § 601 et seq., and the regulations issued thereunder. Sec. 301 of this Act, 56 Stat. 177-180, 50 U.S.C. A.War Appendix, § 633, was enacted March 27, 1942, for the purpose of establishing priorities powers in connection with war contracts and subcontracts. Paragraph (7) of Sec. 633.2(a) (5) provided as follows: "(7) No person shall be held liable for damages or penalties for any default under any contract which shall result directly or indirectly from compliance with this subsection (a) or any rule, regulation, or order issued thereunder, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid." Under this legislation, Priorities Regulation No. 1, Sec. 944.7 (6 CFR Cum.Supp. Title 32, Ch. IX, § 944.7) was issued and read as follows:

"§ 944.7 *Sequence of deliveries.*—(a) Every delivery under a defense order or other rated order shall be made in preference to deliveries under all other contracts or orders whenever, and to the extent, necessary to meet the required delivery date (determined as provided in § 944.8). Deliveries bearing no preference rating or lower perference ratings shall be deferred to the extent necessary to assure those deliveries bearing higher preference ratings, even though such deferment may cause de-

faults under other contracts or orders. Each person who had defense orders or other rated orders on hand must so schedule his production and deliveries that deliveries thereunder will be made on the dates required, giving precedence, in case of unavoidable delay, to deliveries bearing the higher preference ratings.

"(b) The sequence of deliveries bearing the same preference rating shall be determined by the respective dates on which the preference ratings are applied or extended to the deliveries, the delivery to which the preference rating was first applied or extended in point of time having precedence over other deliveries. If the same preference rating is applied or extended on the same day to two or more deliveries on schedule, the sequence of deliveries shall be determined by the required delivery dates (determined as provided in § 944.8)."

Official Interpretation No. 1 thereunder read in part as follows: " * * * Where it is necessary to choose between deliveries bearing the same preference, deliveries to the customers who first applied or extended the rating are to be preferred, * * *"

Both the Goodrich subcontract and the subsequent prime contract 20481 bore identical priority ratings A–1–i and in plaintiff's request for an extension of time for delivery under Contract 20481 it had pointed out its obligation to complete deliveries on its subcontract with Goodrich before proceeding to make raincoats covered by its prime contract with the Government.

However, the findings of January 15, 1943, were to the effect that the cause of delay in delivery of raincoats under Contract 20481 was the contractor's "election" to fulfill its obligations under its subcontract.

Plaintiff's action in complying with the priorities regulations then in existence was construed as an "election" on its part, and damages actually assessed upon the basis of such action. Obviously, the findings could not possibly support such action on the part of defendant, in view of plaintiff's obligations under the regulations which specifically prohibited the imposition of any such liability.

For all these reasons, then, the findings of fact were a complete nullity of no force and effect and plaintiff was not obligated to appeal from them. Livingston v. United States, supra; Karno-Smith Co. v. United States, 84 Ct.Cl. 110, 124. Not only were they made by an unauthorized officer but they reflected complete unawareness of the problem on the part of the deciding officer. Henry Ericsson Company v. United States, 104 Ct.Cl. 397, 429, 62 F.Supp. 312.

Plaintiff was fully justified in its request for a reconsideration of the findings as made, especially in view of the representations made to it by Capt. Godfrey when he discovered the existence of the priorities regulations that a reconsideration might render an appeal unnecessary.

Under the circumstances, plaintiff had done everything which could reasonably have been expected of it in preserving its right of appeal pending the disposition of the application for reconsideration. The fact that the matter was not finally disposed of until April 11, 1945, was due to no neglect on plaintiff's part. The time within which to appeal was tolled during this entire period, and plaintiff's appeal on May 9, 1945, to the Board of Contract Appeals was timely made. Cf. United States v. Ellicott, 223 U.S. 524, 539, 32 S.Ct. 334, 56 L.Ed. 535.

The decision of the Board of Contract Appeals after a hearing on the merits in which it refused to entertain jurisdiction on the grounds that the appeal was untimely because not taken within 30 days of the termination letter of November 20, 1942, was erroneous. Such refusal constituted a denial of plaintiff's rights under Article 26 of its contract. Livingston v. United States, supra; Thomas Earle & Sons, Inc. v. United States, 100 Ct.Cl. 494, 504-505.

Defendant having utterly failed to comply with the conditions to its right for excess costs and liquidated damages is not entitled to relief on its counterclaim. As we said in Tobin v. United States, 103 Ct.Cl. 480, 492, 59 F.Supp. 410, 416: "If we give any heed at all to the idea that provisions for liquidated damages should be narrowly construed, we should hold, as

426

we do, that there was no agreement for liquidated damages in the situation which occurred."

The amount of money here involved was admittedly owed to plaintiff under Contract 14952 and defendant cannot prevail on its plea of set-off unless the proof shows that it complied with the requirements of Article 26 of Contract 20481. The proof, in our opinion, fails in every way to establish such compliance.

From our Finding 15 and what we have said in the course of our opinion, it appears that the delay in deliveries under Contract 20481 was due to unforeseeable causes beyond the control and without the fault of plaintiff. The failure of the strapping was clearly unforeseeable on the part of everyone associated with this contract—the B. F. Goodrich Co., the plaintiff and the defendant. Under these circumstances and the decisions of this court, liquidated damages should not have been assessed against plaintiff. H. B. Nelson Construction Co. v. United States, 87 Ct.Cl. 375, 386-390.

The Government still owes the plaintiff the stipulated balance of $53,964.35 which plaintiff is entitled to recover.

Judgment is entered in favor of plaintiff for this amount. It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, JJ., concur.