# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| Terraseis Trading Limited | ) ASBCA Nos. 58731, 58732 |
| | ) |
| Under Contract No. W91B4N-12-C-5045 | ) |

APPEARANCE FOR THE APPELLANT:      Brian Andrews, Esq.
                                            Raleigh, NC

APPEARANCES FOR THE GOVERNMENT:     Raymond M. Saunders, Esq.
                                            Army Chief Trial Attorney
                                            Robert B. Neill, Esq.
                                            CPT Harry M. Parent, III, JA
                                            Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE MCILMAIL

### INTRODUCTION

Appellant, Terraseis Trading Limited (Terraseis), and the government contracted for Terraseis to provide seismic data collection and processing in Afghanistan. Terraseis did not meet the data collection delivery date, and the government terminated the contract for cause. Terraseis had also presented to the contracting officer a certified claim for alleged delay costs, which the contracting officer denied. In ASBCA No. 58731, Terraseis appeals from the denial of its monetary claim, contending that the government owes it compensation because it delayed in delivering Terraseis's equipment. In ASBCA No. 58732, Terraseis appeals from the termination of the contract, contending that (1) a lack of worksite security excuses its failure to meet the delivery date, and (2) the government waived the delivery date. Only entitlement is before us. The parties submitted the appeal on the record pursuant to Rule 11.

### FINDINGS OF FACT

On 8 August 2012, Terraseis and the Bagram Regional Contracting Center on behalf of the Task Force for Business and Stability Operations (TFBSO) of the Department of Defense (government) entered into Contract No. W91B4N-12-C-5045, in the estimated amount of $9,000,000 for the delivery by Terraseis of seismic data acquisition and other services in Afghanistan (R4, tab 1 at 1-2, 5). The project was designed to support efforts to attract potential investment in the hydrocarbon sector of the Afghan economy (R4, tab 1 at 33). Phase I of contract performance consisted of

data collection; Phase II consisted of data processing (R4, tab 1 at 5). In order to perform Phase I, Terraseis would have to survey, then line cut (that is, clear obstructions and level, with bulldozers), then lay out sensors, and, finally, record data (app. supp. R4, tab 274 at 2, ¶ 2.5). To record, hydraulic trucks called "vibrators" (also referred to as "vibes") would vibrate the ground (R4, tab 104 at 1; app. supp. R4, tab 274 at 1-2, ¶¶ 2.4, 2.5). Terraseis planned to conduct all four activities roughly simultaneously, moving from area to area in a "security bubble," to minimize risk (app. supp. R4, tab 274 at 3, ¶ 3.5). Terraseis planned to begin recording five days after beginning topographical survey and line clearance operations (R4, tab 6 at 20-21).

The contract provides that:

> Contract performance may require work in dangerous or austere conditions. Except as otherwise provided in the contract, the Contractor accepts the risks associated with required work performance in such operations.

(R4, tab 1 at 14 (252.225-7995(b)(2), CONTRACTOR PERSONNEL PERFORMING IN THE UNITED STATES CENTRAL COMMAND AREA OF RESPONSIBILITY (DEVIATION 2011-O0004) (APR 2011))), and that:

> Unless specified elsewhere in the contract, the Contractor is responsible for all logistical and security support required for contractor personnel engaged in this contract.

(*Id.* at 15 (252.225-7995(c))

In addition, the contract incorporated by reference FAR clause 52.212-4(f), CONTRACT TERMS AND CONDITIONS—COMMERCIAL ITEMS (FEB 2012), which provides that:

> The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers.

(R4, tab 1 at 9) The contract also provides:

2

> Private security: If any contractor and its subcontractors at
> all tiers require arming or private security under this
> contract they shall agree to obey all laws, regulations,
> orders, and directives applicable to the use of private
> security personnel in Iraq and Afghanistan.... Contractors
> will ensure that all employees...armed under the provisions
> of this contract, comply with the contents of clause
> 952.225-0001, <u>Arming Requirements and Procedures for
> Personal Security Services Contractors and for Requests
> for Personal Protection</u>.

(R4, tab 1 at 27-28 (clause 952.225-0015(d), HOST NATION CONTRACTOR AND SUBCONTRACTING REQUIREMENTS (AUG 2011))

During the contract's solicitation period, the government agreed to a proposal by Terraseis that the government provide transportation support to and from the "seismic line" (R4, tab 5 at 1). After contract award, the parties attended a 15 August 2012 kick-off meeting attended by the contracting officer (R4, tab 9 at 1). The minutes of that meeting reflect that the government would arrange for the transportation of Terraseis's equipment beginning 10 days after the submission of certain "paperwork," after which it would take 5-7 days to drive to Camp Stone, the delivery point (*id.*). On 23 August 2012, the government submitted that paperwork (R4, tab 10 at 1), making the latest, projected delivery date 9 September 2012, 17 days later. On 28 August 2012, the government received word from its transportation contractor that the equipment would be picked up on 4 September 2012, and that the expected delivery date was 11 September 2012 (R4, tab 11 at 1-2).

By 4 September 2012, Terraseis had contracted with the Afghan government to provide security for the project through a 100-person Afghan Public Protection Force (APPF) (R4, tab 16 at 1). In its 9 July 2012 proposal for the contract, Terraseis proposed that it would contract for an APPF, estimating that 200 APPF guards would be needed "to secure the project area day and night" (R4, tab 6 at 1, 9). Terraseis proposed employing a security bubble consisting of a perimeter of security forces deployed up to 600 meters around its technical crew "to prevent any direct sniper attack on the crew" (*id.*). Terraseis also proposed patrols to deter ambushes and the planting of improvised explosive devices (IEDs) (*id.* at 10).[1] On 26 August 2012, Terraseis began interviewing local personnel as candidates for the APPF (R4, tab 11 at 3). By 10 September 2012, Terraseis had interviewed 85 guards (R4, tab 23 at 1). On 9 September 2012, Terraseis and the APPF entered into a contract for guards for the project (*id.*, R4, tab 30 at 1).

---

[1] In its proposal, Terraseis used the term "EID" to refer to "IED" (R4, tab 6 at 10).

3

On 25 September 2012, Terraseis informed the government that it would like to begin surveying and clearing on 27 September 2012 (R4, tab 62 at 1). On 27 September 2012, the government delivered the first of Terraseis's equipment (*see* R4, tab 67 at 1). However, Terraseis did not begin surveying and clearing until 4 October 2012, because of a delay through 3 October 2012 in licensing weapons for security personnel (R4, tab 73 at 1, tab 75 at 1; app. supp. R4, tab 477 at 3). Terraseis began the work with 100 APPF personnel, and was able to work for 11 days before coming under attack (*see* supp. R4, tab 405 at 1636). Then, on 15 October 2012, Terraseis's crew was attacked by small arms and mortar fire, causing it to pull back to its base camp (app. supp. R4, tab 477 at 2-3).[2] In response, Terraseis on 16 October 2012 suspended field operations and turned to training the APPF, an effort that continued through 5 November 2012 (*see* app. supp. R4, tab 477 at 3). On 18 October 2012, the last of Terraseis's equipment, including the vibes, was delivered to Camp Stone (R4, tab 104 at 1).

On 4 November 2012, 60 Afghan National Civil Order Police (ANCOP) troops arrived at the project site to help protect Terraseis's operations (*see* app. supp. R4, tab 477 at 4). On 5 November 2012, Terraseis's crew was attacked by machine gun fire while setting up a temporary base (R4, tab 139, at 5). No injuries or damage to equipment were reported (*id.*). On 6 November 2012, the crew resumed field operations, and was attacked numerous times by machine gun fire, small arms fire, and rocket-propelled grenades (R4, tab 139 at 6; app. supp. R4, tab 477 at 4). No injuries or damage were reported, but work stopped on each occasion until the attack was over (*id.*). On 7 November 2012, the crew was attacked twice, once for 30 minutes, and the other for three hours (R4, tab 139 at 7-8). The ANCOP troops ran low on ammunition, and withdrew from the project area (*id.* at 7). No injuries were reported, but there was minor damage to ANCOP vehicles and production time was lost (*id.*).

On 12 November 2012, an additional 40 ANCOP troops arrived to help protect Terraseis's operations (app. supp. R4, tab 477 at 5). On 13 November 2012, work resumed (*id.*). On 15 November 2012, in three separate incidents, (1) the crew was ambushed and attacked by rocket and machine gun fire for two hours, causing minor damage to ANCOP vehicles and loss of production time; (2) an IED destroyed a

---

[2] Although elsewhere in the record we find evidence that the first attacks (by small arms, mortars, and rockets) on Terraseis's crew occurred on 16 October 2012 (R4, tab 139 at 3-4), we view the statements in Terraseis's reply brief that "[t]hen, on October 15, the crew received small arms fire and two mortars landed close to where the bulldozer crew was working" (app. reply br. at 6, ¶ 14), and that "[t]here was a concurrent excusable delay of three days from when the crew was attacked on October 15 to when the vibes arrived on October 18" (*id.* at 15), as judicial admissions that the crew was first attacked on 15 October 2012.

Terraseis vehicle, killing the driver and seriously injuring two APPF guards; and (3) small arms fire was directed at a temporary base, causing no injuries or other damage (R4, tab 139 at 9-11). On 16 November 2012, (1) small arms fire was directed at a temporary case, causing ANCOP to run low on ammunition and withdraw from the project area, resulting in the withdrawal of Terraseis's crew and loss of production time; and (2) Terraseis's crew came under small arms fire during its withdrawal from the project area (*id.* at 12-13).

On or about 16 November 2012, Terraseis suspended its operations for security reasons (app. supp. R4, tab 274 at 4, ¶ 4.5). By 18 November 2012, Terraseis's APPF force was down to 41 persons, due to guards quitting after the IED incident (app. supp. R4, tab 477 at 6). On 19 October 2012, the Afghan government pledged another 100 Afghan security forces, and Terraseis asked for an additional 58 security personnel (app. supp. R4, tab 477 at 6). The Afghan government indicated that it would look into providing an additional 50 such personnel (*id.*). On 26 November 2012, Terraseis indicated that it would resume field operations on 6 December 2012, but never did resume those operations (*see* app. supp. R4, tab 477 at 6-7). By 10 December 2012, Terraseis became embroiled in a payment dispute with a supplier who by that date seized Terraseis's equipment, holding it through at least 5 March 2013 (R4, tab 153 at 1; supp. R4, tab 311 at 1-2, tab 312 at 1, tab 314 at 1, tab 315 at 3, tab 316 at 1, tab 317 at 1-2, tab 320 at 1, tab 322 at 1, tab 323 at 1, tab 324 at 1-3).

On 29 November 2012, Terraseis began demobilizing its workforce (app. supp. R4, tab 477 at 6). On 2 December 2012, Terraseis notified the government that it had suspended field operations and demobilized most of its field staff "due to the high costs to Terraseis" of (1) the delayed equipment delivery, (2) repeated attacks on its field operations, and (3) the "delayed mobilization of sufficient government forces to secure the area and permit the recommencement of field activities" (R4, tab 113 at 1). Terraseis requested the negotiation of "revised payment terms, which would allow us to resume operations as soon as possible and ensure timely payment of local sub-contractors and vendors" (*id.*). On 20 December 2012, Terraseis signed Modification No. P00002 (the government signed on 12 January 2013), which extended the delivery date for Phase I to 9 March 2013, and the delivery date for Phase II to 23 March 2013 (R4, tab 127 at 1-3). The modification settled all Terraseis's claims for additional time due to government-caused delay "incurred as of the date of this modification" (*id.* at 1). The modification reserved any claim that Terraseis might have for "possible incurred costs for which the contractor might file a claim at a later date" (*id.*). On 22 December 2012, Terraseis presented to the contracting officer a certified claim for $1,400,146 in costs allegedly arising from a 37-day delay in the government's delivery of the equipment (R4, tab 121 at 1-2). On 31 December 2012, Terraseis reduced the claim amount to $1,348,310 (R4, tab 124 at 1).

5

Except for some scouting of field conditions in early January 2013 (app. supp. R4, tab 477 at 7), Terraseis conducted no field operations in January or February 2013 (R4, tabs 133, 155). On 7 February 2013, as part of a plan to get Terraseis back to work, TFBSO personnel offered to perform a "scouting trip" of the project area with Terraseis personnel; TFBSO Director James L. Bullion also informed Terraseis on that date that he could "confirm that we will make sure that appropriate supplemental security forces will be in place as soon as you are ready to move your crews and vehicles into the field" (R4, tab 137 at 1, tab 141 at 1). In reliance on those statements, Terraseis on 11 February 2013 sent three personnel to Afghanistan, where they waited for instructions (R4, tab 144 at 1; app. supp. R4, tab 275 at 2, ¶ 1.12). However, on 12 February 2013, the contracting officer advised TFBSO not to undertake the scouting trip, warning that "if the contract does not say that the [government] will provide something, we will not provide it" (R4, tab 141 at 1). On 16 February 2013, the contracting officer informed Terraseis that the scouting trip would not take place, and that the government would not arrange or help arrange security (app. supp. R4, tab 274 at 5, ¶ 4.11, tab 275 at 2, ¶ 1.13). The contracting officer also informed TFBSO that "only the contracting officer has the authority to bind the government" (app. supp. R4, tab 273 at 8:21-22).

On 9 March 2013, Terraseis still had not delivered Phase I (app. br. at 9, ¶ 20). On 16 March 2013, the contracting officer terminated the contract for cause (R4, tab 157 at 1). On 5 May 2013, the contracting officer denied Terraseis's certified claim (R4, tab 161 at 1-2). Terraseis timely filed these appeals on 11 June 2013.

DECISION

*ASBCA No. 58731: Is Terraseis entitled to compensation due to equipment delivery delay?*

In ASBCA No. 58731, Terraseis seeks compensation for what it alleges are 28 days of delay caused by the government not having delivered Terraseis's vibes to Camp Stone until 18 October 2012 (app. reply br. at 13-15). We sustain the appeal, in part. Prior to contract award, during the solicitation phase, the parties agreed that the government would deliver Terraseis' equipment, but did not include in that agreement or in the contract that was eventually awarded any schedule for that delivery. "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." *Pacific Gas & Electric Co. v. United States*, 536 F.3d 1282, 1289 (Fed. Cir. 2008) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 204); *Sundstrand Corp.*, ASBCA No. 51572, 01-1 BCA ¶ 31,167 at 153,957 (same). Thus where a contract calls for a single performance such as the rendering of a service or the delivery of goods, the parties are most unlikely to agree explicitly that performance will be rendered within a

"reasonable time"; but if no time is specified, a term calling for performance within a reasonable time is supplied. RESTATEMENT (SECOND) OF CONTRACTS § 204 cmt. d.

We find that a delivery schedule is essential to a determination of the parties' rights and duties regarding equipment delivery, and supply a term calling for "delivery within a reasonable time." We further find that a reasonable time for delivery of the equipment is the schedule reflected in the minutes of the kick-off meeting that the parties held one week after the contract was awarded: that is, delivery within 17 days of the submission by the government of certain paperwork. In so finding we consider the contracting officer's attendance at the kick-off meeting, and the absence of any evidence in those minutes that anyone at the meeting voiced any objection or caveat to that schedule.

The government submitted the paperwork on 23 August 2012, making the equipment due at Camp Stone by 9 September 2012. Although equipment began arriving on 27 September 2012, the vibes (the equipment necessary to perform the final, recording phase of the data collection work) were not delivered until 18 October 2012, 39 days later. Terraseis admits to two periods of concurrent delay: (1) a 6-day delay due to weapons licensing issues that ended on 3 October 2012, and (2) a 3-day delay due to a 15 October 2012 attack on its crew that ended on 18 October 2012 (app. reply br. at 15). Although subtracting those 9 days of concurrent delay leaves 30 days of potential government-caused delay, Terraseis claims only 28 days of government-caused delay, between 11 September 2012 (7 days after the equipment was picked up by the government's transportation subcontractor) and 18 October 2012 (the day the vibes were delivered).

Because of issues regarding weapons licensing, Terraseis was not ready to begin field operations until 3 October 2012, and did not begin those operations (initially, surveying and clearing) until 4 October 2012. Consequently, Terraseis is not entitled to compensation for any days before 4 October 2012. According to Terraseis's plan, it would have performed surveying and clearing activities for five days before recording with the vibes; therefore, Terraseis would not have been ready to use the vibes until 9 October 2012. Terraseis concedes that "there was a concurrent excusable delay of three days from when the crew was attacked on October 15 to when the vibes arrived on October 18" (app. reply br. at 15). Consequently, we find that the government's delay in delivering Terraseis's vibes delayed Terraseis's completion of the contract work by 6 days, from 9 October 2012 through 14 October 2012. That is, had the government delivered the equipment, including the vibes, by 9 September 2012, Terraseis would have been able to record from 9 October 2012 through 14 October 2012, the day before the 15 October 2012 attack resulted in a suspension of operations through 17 October 2012. Therefore, Terraseis is entitled to compensation for 6 days of delay, from 9 October 2012 through 14 October 2012. Although the government contends that Terraseis is not entitled to

not entitled to any compensation because it concurrently delayed in obtaining the security necessary for contract performance (gov't br. at 41), we disagree; APPF guards provided security sufficient to allow Terraseis to perform contract work at least from 4-14 October 2012.

Although the government contends that Terraseis has not provided a delay analysis (gov't br. at 40), Terraseis has identified periods of government-caused delay and concurrent delay. Furthermore, we find that the vibes could have been used beginning on 9 October 2012, that they were critical to the completion of the project as a whole, and, therefore, that the delay in delivering the vibes delayed the project as a whole. *See G. Bliudzius Contractors, Inc.*, ASBCA No. 42366 *et al.*, 93-3 BCA ¶ 26,074 at 129,592-93. Because the government delayed completion of the work by six days, Terraseis is entitled to six days of compensated delay. Accordingly, ASBCA No. 58731 is sustained to that extent.

*ASBCA No. 58732: Was the termination of the contract for default justified?*

*Did Terraseis default?*

A contractor's failure to timely deliver agreed-upon goods establishes a prima facie case of default. *General Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360, 1363, *supplemented on reh'g*, 527 F.3d 1375 (Fed. Cir. 2008). Terraseis did not deliver Phase I by 9 March 2013; that failure establishes a prima facie case of default.

*Did the government waive the delivery date?*

Terraseis contends that the government waived the 9 March 2013 delivery date by engaging in negotiations in February 2013 to continue the contract when it was clear that Terraseis could not meet the 9 March 2013 delivery date, and by promising to provide security and a helicopter scouting trip "so that the project could continue" (app. br. at 16). We disagree. Where the government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right to terminate the contract for default. *Empire Energy Management Systems, Inc. v. Roche*, 362 F.3d 1343, 1354 (Fed. Cir. 2004). To prove such waiver, a contractor must show: (1) failure to terminate within a reasonable time after default under circumstances indicating forbearance; and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the government's knowledge and implied or express consent. *Id.* at 1354-55. Pre-default actions by the government to encourage completion of the work do not waive a delivery date. *See id.* at 1355.

Here, the government terminated the contract on 16 March 2013, within a week of the 9 March 2013 delivery date that Terraseis failed to meet. We find that

8

one-week period a reasonable time after default. In addition, Terraseis did not perform past a due date; it ceased field operations in November 2012, long before the 9 March 2013, Phase I delivery date. Furthermore, the representations made by TFBSO regarding the scouting trip and arranging security were made in early February 2013, a month before the 9 March 2013 default date,[3] and so were pre-default actions to encourage Terraseis's completion of the work. Finally, those representations did not induce Terraseis to continue performance: Terraseis did not resume field operations based upon those representations, it sent three people to Afghanistan to wait for instructions. For all these reasons, Terraseis fails to prove that the government waived the delivery date.

### *Was the default excused?*

A contractor must show that its failure to deliver was excusable. *General Injectables*, 519 F.3d at 1363. Pursuant to FAR 52.212-4(f), an excusable failure occurs when it is caused by an occurrence beyond the reasonable control of the contractor and without its fault or negligence. *Id.* Terraseis contends that its failure to meet the delivery date is excused because (1) it was not foreseeable that the Afghan government, with which Terraseis contracted for security, did not provide the security necessary for the project; and (2) the issuance on 17 August 2010 of a decree by the President of Afghanistan had "disbanded all private security companies and essentially monopolized all private security under the Afghan government," "foreclos[ing] any option for [Terraseis to] hire a different security contractor or to even self-secure" (app. br. at 13-14).[4] We find that Terraseis's failure to meet the delivery date is not excused.

First, Terraseis entered the contract in 2012, and, therefore, is charged with knowledge of the 2010 presidential decree. Second, contractors are bound by the unexcused nonperformance of their subcontractors. *General Injectables*, 527 F.3d at 1378. In other words, "[t]he contractor alone is responsible for the deficiencies of its suppliers and its subcontractors absent a showing of impossibility." *Id.* Terraseis does not contend, much less demonstrate, that the Afghan government's nonperformance was excusable or impossible. Third, the contract (1) states that

---

[3] Those representations were not made by the contracting officer; indeed, the contracting officer disavowed those representations on 16 February 2013, well before the 9 March 2013 delivery date. Notably, Terraseis does not contend that anyone with authority to bind the United States in contract agreed that the government would provide or facilitate the provision of security for the project.

[4] Terraseis provides no record citation for, nor any copy of the decree, and does quote its contents; however, the government does not contest Terraseis's representation. For purposes of the appeal, we accept Terraseis's contention regarding the existence of the decree and its requirements.

9

"[c]ontract performance may require work in dangerous...conditions," (2) provides that "the Contractor accepts the risks associated with required work performance in such operations," and (3) makes the contractor "responsible for all...security support required for contractor personnel engaged in [the] contract." Under these circumstances, Terraseis is responsible for any failure to provide security on the part of its subcontractor, the Afghan government, and, therefore, cannot point to lack of security as an excuse for failure to meet a delivery date.

Fourth, we reject Terraseis's unforeseeability argument. Terraseis contends that the Afghan government had provided adequate security for two previous seismic projects, making its failure to provide adequate security for this project unforeseeable, excusing Terraseis's nonperformance (app. br. at 14-15). We disagree. For the Afghan government's nonperformance to excuse Terraseis's nonperformance, the former must be excusable, not merely inconsistent with past performance. *See General Injectables*, 527 F.3d at 1378. Although Terraseis relies upon *H.B. Nelson Construction Co. v. United States*, 87 Ct. Cl. 375 (1938), and *Climatic Rainwear Co., v. United States*, 115 Ct. Cl. 520 (1950), those cases are inapt. In both cases the relevant contract language expressly included the concept of unforeseeability. In *H.B. Nelson*, the contract provided that "the right of the contractor to proceed shall not be terminated...because of any delays in the completion of the work due to *unforeseeable* causes beyond the control and without the fault or negligence of the contractor." 87 Ct. Cl. at 380 (emphasis added). In *Climatic Rainwear*, the contract provided that "the contractor shall not be charged with liquidated damages or any excess cost when the delay in delivery is due to *unforeseeable* causes beyond the control and without the fault or negligence of the contractor." 115 Ct. Cl. at 533 (emphasis added). Notably, the comparable contract provision here, FAR clause 52.212-4(f), omits any express reference to unforeseeability: "[t]he Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence." That at least suggests that foreseeability is not a factor in determining whether contractor performance is excused.

Even if foreseeability is a factor, we find this case distinct from *H.B. Nelson* and *Climatic Rainwear* on that point. In *H.B. Nelson*, a railroad damaged steel trusses in the course of transporting them; the court found that the resulting delay to the contractor's construction work was unforeseeable because "[o]bviously neither the contractor nor the [government] would under the facts of this case have anticipated or given thought to what did happen to this steel." 87 Ct. Cl. at 380-81, 387-89. In *Climatic Rainwear*, raincoats leaked at the seams because of a subcontractor's "strapping," even after government tests indicated that the problem had been solved. 115 Ct. Cl. at 535-36. The court found that the resulting delays in raincoat deliveries were excusable because "[t]he failure of the strapping was clearly unforeseeable on the part of everyone." *Id.* at 567-68. In the two cases, essentially, the court found that,

10

under the circumstances, once the trusses were handed over to the railroad and the raincoats passed the government's tests, there was no reason for anyone to think that anything would go wrong.[5]

This, however, is a much different situation. Even before the contract was awarded, it was understood that security would be a difficult and constant challenge. Indeed, Terraseis foresaw the threat, and proposed specific measures to address it. Within a week of the start of field operations, the threat presented itself and never fully abated. Security was always a concern; consequently, it was always foreseeable that something might go wrong and security efforts might not succeed, either because the challenge was too great or because Terraseis would be unable to persuade the Afghan government to provide the necessary level of security.[6] And it is not as though Terraseis encountered a different condition than it expected; rather, Terraseis encountered the same threat that it had planned to confront when it entered the contract.

Fifth, with respect to impossibility, Terraseis contends that contract performance was impossible both due to the lack of adequate security (app. br. at 12), and because contract clause 952.225-0001 precluded the offensive military action that the TFBSO was eventually decided was required after the death of an APPF soldier (app. reply br. at 15-16). We reject those contentions. Terraseis performed contract work during the period 4-14 October 2012, and on some days thereafter (even after a driver was killed by an IED that destroyed his vehicle), demonstrating that it was possible to perform the contract. With respect to clause 952.225-0001 (the language of which Terraseis does not recite), that clause addresses private security.[7] By contrast, Terraseis's theory is that the Afghan government failed to provide adequate security. We do not view the Afghan government as a private security entity, such that any prohibition in clause 952.225-0001 against offensive military action would prevent the Afghan government from securing the project area.

Sixth, Terraseis contends that its default is excused because the Afghan government's actions constitute sovereign acts. Although the FAR does not define the term "the Government," *see* FAR Part 2, Definitions of Words and Terms, we have no difficulty interpreting that term as limited to appellant's contracting partner; that is, the Government of the United States, as opposed to some other government, such as the Afghan government. *Cf. Pyramid Construction & Engineering Corp.*, ASBCA

[5] Delays caused by common carriers like the railroad in *H.B. Nelson* are expressly excusable under FAR clause 52.212-4(f).

[6] Terraseis played at least some part in providing security beyond contracting for it: Terraseis interviewed candidates for the APPF, identifying 85 candidates.

[7] Clause 952.225-001 is not set forth in the contract, nor is it incorporated into the contract. However, it is referenced in clause 952.225-0015(d).

11

government did not entitle contractor to equitable adjustment in price of contract with the United States government because the increase was the sovereign act of a government not a party to the contract). Indeed, Terraseis cites no authority in support of any broader interpretation. Moreover, the contract elsewhere uses the term "the Government" to refer implicitly to the Government of the United States; for example, referring to contract line item number (CLIN) 0002, the contract provides that "[t]he contractor may invoice *the Government* up to two times for payment against this CLIN" (R4, tab 1 at 5) (emphasis added), indicating that in context, the term "the Government" means the entity obligated to pay Terraseis for services provided; here, the Government of the United States. The contract also implicitly distinguishes between the Government of the United States and at least some other government; its contract incorporates by reference DFARS clause 252.209-7004, SUBCONTRACTING WITH FIRMS THAT ARE OWNED OR CONTROLLED BY GOVERNMENT OF A TERRORIST COUNTRY (DEC 2006) (R4, tab 1 at 9), which expressly distinguishes between "the Government" and "the government of a terrorist country." Finally, if any further explanation of the term "the Government" is needed, the contracting officer signed the contract on behalf of the "United States of America" (R4, tab 1 at 1). Consequently, within the meaning of FAR clause 52.212-4(f), only the sovereign acts of "the Government," that is, the Government of the United States, might excuse a contractor's failure to perform.

Finally, Terraseis was concurrently delayed from at least 10 December 2012 through at least 5 March 2013 by the seizure of its equipment by a supplier who claimed that Terraseis owed him money. Terraseis points to no evidence that the supplier released the equipment prior to the termination of the contract. Therefore, we infer and find that the equipment was still held on 9 March 2013, the delivery date that Terraseis failed to meet. Consequently, we find that a lack of equipment was an independent, concurrent, and unexcused cause of Terraseis's failure to meet the 9 March 2013 delivery date.

Because (1) Terraseis defaulted on a delivery date, (2) the government did not waive the delivery date, and (3) the default was not excused, the termination of the contract for default was justified. Accordingly, ASBCA No. 58732 is denied.

12

## CONCLUSION

ASBCA No. 58731 is sustained in part and is remanded to the parties to resolve quantum. ASBCA No. 58732 is denied.

Dated: 19 November 2015

TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58731, 58732, Appeals of Terraseis Trading Limited, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals