Booth, Chief Justice,
delivered the opinion of the court:
The record in this case establishes the fact that the defendant in preparing the blue prints, drawings and specifications for the work to be done under the contract involved, mistakenly included in the area to be paved 1,690 square yards of pavement which had been completed by the defendant prior to the awarding of the contract.
The controversy with respect to this item in suit may be solved only upon the following facts and contentions of counsel: The plaintiff responded on October 22, 1933, to an invitation to submit bids for the construction of a seaplane hangar at the Naval Fleet Air Base, Coco Solo, Canal Zone. Plaintiff’s bid was accepted and a contract between the parties was entered into January 27, 1934.
The contract provided that the plaintiff was to receive $200,000 for performing the contract work. The usual details incident to governmental transactions of this nature were observed. The plaintiff was furnished a blue print, drawings, and lengthy specifications which set forth, among other things, the precise area which was to be paved by the use of concrete. At least seven-eighths (⅞ths) of the concrete to be laid was to be used in paving.
The contract, blue print, drawings, and specifications were prepared by the Bureau of Yards and Docks located in Washington, and the officials of the Bureau engaged in their preparation were not aware that 1,690 square yards of concrete paving within the precise area covered by the contract had previously been laid, nor that this fact should have been disclosed upon the blue print and drawings. This paved area was inadvertently omitted from the papers mentioned.
Neither the plaintiff nor the defendant had knowledge of the mistake when the contract was executed. The plaintiff’s *384 bid was based upon the performance of the work in accord with the blue print, drawings and specifications, and it was not discovered until its personal representative reached the site of the work that the area to be paved should have been diminished to the extent of 1,690 square yards.
When the mistake was discovered by the defendant’s officials in charge of the work and made known to plaintiff’s personal representative, the defendant proposed that the plaintiff pave an area adjoining the contract work sufficient in extent to make up for the paved area omitted from the drawings, and thereby receive for the completed work the full contract price.
Defendant’s proposed adjustment of the error involved was accepted by the plaintiff’s then personal representative on the work, and the successor to plaintiff’s first representative on the work was likewise advised as to defendant’s proposal. This situation continued until October 3,1934, when the defendant by letter questioned the plaintiff as to whether it wanted to accept the benefits of the proposed adjustment due to the mistake in the drawings.
The plaintiff finally declined to lay the additional 1,690 square yards of pavement, in the face of a positive warning from the defendant that refusal to do so would necessitate the issuance of a change order as provided in the contract, eliminating the 1,690 square yards of pavement from the area to be paved under the contract, and resulting in a diminution of the consideration stipulated in the contract.
The defendant did on December 24, 1934, issue change order B, and by the provisions of this order the 1,690 square yards of pavement in place prior to the letting of the contract were eliminated from the contract, and $3,914.87, the reasonable cost of the paved area, was deducted and withheld from sums due the plaintiff. The plaintiff’s first cause of action is for the recovery of this sum.
An argument is advanced in support of a contention that the plaintiff performed all the work exacted under-the contract, and to sustain it refers to the schedule of prices which the plaintiff was required to prepare and submit to the Bureau of Yards and Docks. It is true the *385 schedule of prices was required under paragraph 30 of the general provisions of the specifications, and while they reflected to some extent the quantity of work to be done they were in no sense conclusive and were employed by the defendant in the preparation of monthly estimates upon which to make monthly payments to the plaintiff as the work advanced. This contention is devoid of merit. The schedule was simply a method of ascertaining work performed and payments for it.
Many cases are cited in plaintiff’s brief. They have been carefully analyzed, both as to facts and law, by plaintiff’s counsel, and it is obvious that they relate to the jurisdiction of courts and the circumstances under which they will not relieve from liability for a mistake of fact. It is not essential to mention them in this opinion. The facts of the instant case negative their application with respect to liability as contended for by plaintiff.
Restricting the contract provisions to the one item of paving, this record indisputably discloses that the plaintiff contracted to pave 3,392 cubic yards of concrete pavement for the agreed price of $200,000 including the construction of the hangar. The contractor did not lay 3,392 cubic yards of pavement; it not only did not do so, but was not required to do so, and hence was saved the expense of paving 1,690 square yards of the 3,392 cubic yards.
The contractor was paid in accord with the contract for every item of work actually performed, and the only deduction from its pay, so far as paving is concerned, was the reasonable cost to the defendant of laying the 1,690 square yards of pavement which was obviously an expense incurred by the defendant. The contractor may not recover for work not performed. No injury followed from the innocent error of the defendant to either party to the contract, and no case is cited where either at law or in equity a judgment of the character sought as to this item has been awarded.
Aside from what has just been said, the contractor was as much to blame as the defendant for the mistake relied upon. The degree of negligence, if any is established, is equal. Paragraph 7 of the specifications expressly warned *386 the contractor that conditions at the site of the work were only believed to be reasonably correct and that the “Government does not warrant either its completeness or accuracy.” The contractor was told to visit the site and ascertain actual conditions prior to submitting its bid. This it did not do.
An additional defense is available to the defendant. Article 3 of the contract authorized the contracting officer to make changes in the drawings and specifications which formed part of the contract. The provisions of this article are set forth in the findings, and acting under the authority contained in this article the defendant did make the change which by proper change order culminated in the deduction herein sued for.
It is true the above change order was issued December 24, 1934, after the contract work had been completed and settlement for its performance was in progress. Nevertheless it is a matter about which the plaintiff may not complain. The findings show and the record establishes that when the mistake was discovered the parties agreed to rectify it by the contractor laying 1,690 square yards of pavement in area adjacent to the contract area, and it was not until October 5, 1934, that final refusal to do so was received by the defendant.
SECOND CAUSE OE ACTION
Article 9 of the contract is in part as follows:
Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God * * *.
The contract specifications required the contractor to furnish and use in the construction of the seaplane hangar about fifty-four (54) steel trusses. This material, both as to size and condition, was a most essential factor in constructing the hangar itself and in the expedition of the contract work. While some work of minor importance might have proceeded without the trusses in place, it is established *387 that the placing of the trusses was important and of prime necessity if the contractor was to complete the work on time.
The contractor had made a timely contract for the fabrication and shipment to the Canal Zone of the trusses. They were to be shipped from Birmingham, Alabama, to Coco Solo, and the means available for transportation were the railroad to New Orleans and the United Fruit Company boats from New Orleans to Cristobal, Canal Zone.
The shipment arrived' at Cristobal and was then transported from there to Coco Solo by the Panama Railroad. Thus it is apparent that in order to accomplish the shipment the trusses had to be handled six times. When they arrived at Coco Solo and were inspected aboard the cars it was discovered that the trusses were badly bent, so much so as to render them incapable of use and subject to rejection by the Government inspector.
The contractor at first refused to accept the shipment and declined to unload it from the railroad cars. Its action was impelled by a fear that in accepting the shipment its right of action would be lost against one or all the transportation companies for negligence in handling the same. Nine days were consumed in negotiations respecting this issue, and at the end of the period the contractor unloaded the trusses.
The next problem which confronted the contractor was a serious one. To duplicate the order for fabrication and shipment of a like number of trusses admittedly involved a prolonged period of delay, and to render the trusses usable by straightening out the bends with available resources for doing so also involved delay. The defendant’s officials on the site cooperated with the contractor to the limit of their power, and the contractor began and expeditiously performed the necessary work included in restoring the trusses to their normal condition. This required a period of twenty-two days.
The record does not disclose that the contractor procrastinated in handling this unforeseen situation, except the bare possibility that too much time was consumed in negotiations with the transportation companies, and we think *388 this is .unimportant. The usual and customary means of transportation were resorted1 to by the contractor, and none of its acts can be construed as in any way contributing to the injury to the trusses.
Of course it is usually easy after an accident has happened to point out how it might have been forestalled. In this case the record does not establish responsibility for the injury to the trusses. It was not the duty of the plaintiff to do more than it did with respect to their shipment, and the record is clearly one which establishes that the injury to the trusses caused an unforeseen delay for which the contractor is not liable.
The officials of the defendant on the site and in charge of the contract work recommended an extension of time be granted the contractor on account of the injury in transitu to the trusses. The Chief of the Bureau of Yards and Docks on July 11,1934, in a letter, denied plaintiff’s request for an extension, in which he held “The bending of the steel in transit is not, however, considered by the Bureau to be a cause excusing delay under Article 9 of the contract.” On an appeal from the above decision to the Secretary of the Navy this official affirmed the decision of the Bureau of Yards and Docks.
Article 9 of the contract is in part as follows:
* * * Provided further, That the contractor shall within 10 days from the beginning of any such delay notify the contracting officer in' writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within thirty days, by the contractor to the head of the Department concerned, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
Similar articles in Government contracts have been repeatedly before this and the Supreme Court. The scope and effect of such a contractual provision is well established. United States v. Gleason, 175 U. S. 588. See also Carroll v. *389 United States, 76 C. Cls. 103. It has long since been Held that the decision of the final official possessed of appellate jurisdiction over the subject matter is final, and “that in the absence of fraud, or of mistake so gross as to necessarily imply bad faith” it may not be challenged in the courts.
We can not escape the conclusion that the decision denying the plaintiff an extension of time due to the injury inflicted upon the steel by the transportation of the same was erroneous in not holding that it was under the contract an unforeseen cause of delay for which the contractor is not responsible under Article 9 of the contract. The decision, we think, is grossly erroneous and arbitrary.
Unforeseen delays excusable under Article 9 can not be arbitrarily limited to delays which subsequent to the event might within the range of possibility have been avoided. Where a contractor resorts to the usual and long-established methods employed by the commercial world in general to obtain material to perform the contract he has no cause to suspect that such instrumentalities will fail in the discharge of their duties. Obviously neither the contractor nor the defendant would under the facts of this case have anticipated or given thought to what did happen to this steel.
The decision of the Chief of the Bureau of Yards and Docks does not contain a reference to facts or afford any basis for the conclusion reached, except that in the opinion of the officials the contractor’s request can not be granted under Article 9 of the contract. What is or is not an unforeseen cause of delay under Article 9 is not altogether a question of fact. Manifestly to ascertain a correct application of the facts to this provision of Article 9 involves the issue as to what the parties to the contract intended by the use of the language they did use. Was it an event over which the party had no control, and had absolutely no reason to anticipate ? If so, the facts of record sustain the plaintiff’s request. When the appeal reached the Secretary of the Navy the matter was referred to the Judge Advocate General of the Navy, and apparently from the record the final decision of the Secretary of the Navy was predicated upon this official’s decision, as well as confirming the decision of the Chief of the Bureau of Yards and Docks.
*390 We can not withhold the comment that if the defendant had been obligated under the contract to deliver this steel in time for the contractor to complete its contract, and the failure to discharge its obligation was caused as it was in this case, the defendant would sedulously insist that the cause of delay was unforeseen. We think the plaintiff is entitled under the cases cited to recover the amount deducted under this item in suit. Judgment for the plaintiff for $2,800. As to item one, the petition is dismissed. It is so ordered.
Whalev, Judge; Williams, Judge; Littleton, Judge; and Geeen, Judge, concur.