POLORON PRODUCTS, Inc.
v.
UNITED STATES.
No. 48997.

United States Court of Claims.
Dec. 1, 1953.

Josephus C. Trimble, Washington, .D. C., Max L. Rosenstein, Newark, N. J., on the brief, for plaintiff.

Edward L. Metzler, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

Plaintiff, a New York corporation with its principal place of business at New Rochelle, New York, brings this suit to recover an alleged loss of $64,110.58 which it contends resulted from the wrongful acts of the defendant in partially terminating a contract under which plaintiff agreed to manufacture for the Quartermaster Corps of the Army a quantity of stainless steel canteens.[1] Pursuant to Rule 38(c), Rules of Court of Claims, 28 U.S.C.A. and a stipulation of the parties, the only question now presented is on the issue of liability.

In answer to invitations to bid issued by the Jeffersonville Quartermaster Depot, Jeffersonville, Indiana, for the procurement of 2,671,000 stainless steel canteens, the plaintiff firm on March 17, 1943, submitted an offer to produce the entire quantity. Following negotiations with personnel of the Depot, plaintiff, on March 26, revised its offer to apply to 500,000 canteens, at 74 cents each, to be delivered at specified intervals beginning on July 10, 1943. This revised bid was accepted by the Quartermaster Depot in a telegram of the same date. A definitive contract, dated March 30, 1943, was prepared by the Depot and forwarded to plaintiff, whose officers executed the "Contractor's Acceptance" thereto on April 5, and returned it to the Depot for the signature of the contracting officer.

Because the Office of the Quartermaster General in Washington did not approve of the award of this contract to the plaintiff, the contracting officer at

---

1. Plaintiff's claims under the Lucas Act, 60 Stat. 902, 62 Stat. 869, contained in paragraphs 17 through 20 of the petition were dismissed in open court on January 3, 1950, on defendant's motion.

Jeffersonville Quartermaster Depot did not immediately execute the contract. This disapproval or dissatisfaction was based on the fact that actual experience in the manufacture of canteens from stainless steel had involved more difficulties in fabrication than were originally anticipated, and the Quartermaster personnel in Washington objected to this award to a contractor without experience and tools while other contractors with experience and adequate facilities were left out or that awards were made for smaller orders. The Washington office warned the contracting officer of the serious possibility of delays by plaintiff in meeting delivery dates, and because of the urgent need for the canteens recommended that plaintiff's contract be canceled. This the contracting officer did not do, but after further inspections of plaintiff's plant and facilities, the parties amended the contract so as to reduce the quantity called for to 300,000. This revision, Modification A, also increased the unit price to 85 cents and revised the delivery schedule to read as follows:

30,000 canteens on or before July 31, 1943.
30,000 canteens on or before August 10, 1943.
30,000 canteens on or before August 20, 1943.
30,000 canteens on or before August 31, 1943.
30,000 canteens on or before September 10, 1943.
30,000 canteens on or before September 20, 1943.
30,000 canteens on or before September 30, 1943.
30,000 canteens on or before October 10, 1943.
30,000 canteens on or before October 20, 1943.
30,000 canteens on or before October 31, 1943.

---

Plaintiff was unable to meet any of the delivery dates for the canteens, as set out in Modification A of the contract. The first delivery of July 31, 1943, was met only when plaintiff subcontracted with one of two experienced firms in the field who delivered the 30,000 canteens due on that date. In answer to its request for a time extension, the officer in charge of procurement at the Jeffersonville Quartermaster Depot wrote plaintiff on July 21, 1943, that the contract delivery schedule,

" * * * must be met; otherwise the undelivered balance at the end of each scheduled period will be terminated and purchased in the open market, and any excess cost charged to your account.

"These canteens for acceptance may be produced in your own plant, or partially or wholly fabricated by a subcontractor.

"Your request for an extension of time cannot be granted, as you stated in your bid dated 17 March 1943, that you could deliver 300,000 by 30 June 1943, and 475,000 by 31 July 1943, or a total of 775,000 canteens. The Supplemental Agreement, dated 8 May 1943, modifying your contract of 30 March 1943, includes a delivery schedule of 30,000 Canteens, stainless steel to be accepted by the Government Inspector between 20 and 31 July 1943. This is an extension of approximately seven weeks from the time indicated in your bid to the time actual acceptances were required. * * *

"In the original bid space was provided for listing any additional equipment or facilities required to produce this item. Under this item no additional facilities were listed. On 12 May 1943, a Government Inspector visited your plant, at which time you stated all tools and dies would be ready by 15 June 1943, and at no time in the course of submit-

ting your bid, or in correspondence, did you indicate that new capital equipment would be necessary; therefore, you have now had approximately ten weeks in which to complete the tools and dies and get into production."

Upon failure to meet the August 10 delivery date, the contracting officer on August 16, 1943, wrote plaintiff as follows, terminating its right to proceed with the second delivery:

"Due to your failure to comply with the schedule of delivery, as provided for in the subject contract, you are hereby notified that pursuant to the provisions of the Delays-Damages Article, known as Article 10 therein, your rights to proceed with the manufacture and delivery of 30,-000 Canteens, Stainless Steel, which quantity is delinquent as of 10 August 1943, at a unit price of $.85 each and in the total amount of $25,-500.00 is hereby terminated effective as of this date."

Provisions of the contract relating to damages for delay and disputes pertinent here were as follows:

"10. Delays-Damages.—If the Contractor refuses or fails to perform. this contract within the time specified, or any extension thereof, the Government may, by written notice, terminate the right of the Contractor to proceed with deliveries or with such part or parts thereof as to which there has been delay, and may hold the Contractor liable for any damage caused the Government by reason of such termination.
* * *

"11. Disputes.—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are

not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor. Within 30 days from said mailing the Contractor may appeal to the Secretary of War, whose decision or that of his designated representative, representatives or board shall be final and conclusive upon the parties hereto. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract."

Plaintiff, not being possessed of the facilities to make the necessary dies, was required to subcontract for the making of that equipment. After much inquiry, plaintiff on April 21, 1943, entered into a contract with the Sim Tool & Die Company of Brooklyn, New York, for a complete set of dies to produce the lower half of the canteens deliverable on or before June 15, 1943.[2] However because of that company's inability to produce satisfactory dies, plaintiff on August 8, 1943, re-ordered the dies from another tool and die maker who finally delivered workable dies to plaintiff on November 18, 1943. It was not until that date that plaintiff was equipped to produce canteens under the contract.[3]

Similar "notices of terminations" were sent plaintiff upon plaintiff's failure to meet its delivery schedule for canteens due on the following dates:

30,000 canteens on August 20, 1943. Notice dated August 23, 1943.
30,000 canteens on August 31, 1943. Notice dated September 3, 1943.
90,000 canteens on September 10, 20, and 30, 1943. Notice dated October 4, 1943.

During August and September of 1943, plaintiff by letters protested the termination actions of the contracting officer. The contracting officer again rejected

2. Plaintiff subcontracted with another firm for the production of dies for the upper half and although those dies were late in delivery, it was not a contributing factor to any of the delays later incurred.

3. Plaintiff later instituted suit against Sim Tool & Die Company in a New York court for breach of contract, for its failure to deliver the dies. This suit was settled upon the subcontractor's payment of $4,000 to plaintiff.

592

plaintiff's requests for time extensions, ruling that the sole cause of plaintiff's delay was its failure to obtain satisfactory dies which excuse he held not to be excusable under the contract. These letters read in part as follows:

"The information that you have listed in your letter of 24 August 1943 for failing to comply with delivery schedule on subject contract has been carefully reviewed and studied. After due consideration and a careful review of delivery inspection reports submitted by the Government Inspector assigned to your Plant, it has been decided that two of the references which you have given did not cause the delay in production. Even though the stainless steel had been delivered to you in large quantities and the Canteen Caps were delivered in accordance with schedule with your subcontractor, delivery could not have been made because you would not have the necessary equipment set up, as well as the dies on hand to produce stainless steel Canteens.

Consideration to reinstate the 60,-000 Canteens terminated on subject contract cannot be given and you are again advised that there will be further terminations if you become delinquent on the contract as scheduled.

\* \* \* \* \* \*

"*The reasons you give for being delinquent on subject contract are not considered excusable and this office has again made an investigation of the causes for delay and found that the reason has been your inability to secure suitable dies.* Even though an abundance of material has been delivered to your plant, production could not have been started because your equipment was not ready to produce.*" [Italics supplied.]

Plaintiff made no effort to appeal any of these rulings to the head of the department within the 30 days required under Article 11 of the contract, but in October 1943, because of its inability to meet any of the delivery dates, plaintiff initiated negotiations with Quartermaster Corps personnel which resulted in a revision of the contract, reducing the total amount to be delivered and establishing a delivery schedule of 25,000 for October, 35,000 for November, and 30,000 for December of 1943.

Upon failure of plaintiff to meet the October delivery, the contracting officer in a notice of termination similar to those mentioned above terminated plaintiff's right to deliver that quota. While plaintiff continued in default under this third revision, no further terminations were put into effect, but instead the contract was again amended in an effort to enable plaintiff to complete delivery of the reduced contract quantity by March 1, 1944. Plaintiff's completed deliveries under the contract for which it has received payment were as follows:

| | |
|---|---:|
| December 28, 1943 | 25,050 |
| February 1, 1944 | 27,000 |
| March 8, 1944 | 12,950 |
| April 1, 1944 | [1]6,750 |
| Total delivered | 71,750 |

Although plaintiff on several occasions, beginning in July 1944, directed protests to the War Department and General Accounting Office requesting formal findings of fact by the contracting officer and arguing the excusability of its delays, it was not until November 13, 1945, that an appeal was filed with the Secretary of War asserting that the above mentioned partial terminations in 1943 and 1944 of the contract were illegal.

Following hearings on March 21, 22, and 23, 1946, the appeal was dismissed by the War Department Board of Contract Appeals acting as the duly authorized representative of the Secretary of War. The pertinent portions of the Board's decision are set out in finding 37.

1. (Contract overrun excepted)

Plaintiff then instituted this action on the grounds that (1) it had never been furnished with sufficient findings of fact by the contracting officer upon which to base an appeal, (2) the delays entailed resulted from the acts of defendant, (3) those causes of delay chargeable to plaintiff were excusable under the contract, and (4) the conduct of defendant's representatives amounted to a fraud upon the plaintiff.

Defendant takes the position that under the express terms of the contract the contracting officer's notices of termination were sufficient, and that plaintiff is precluded from recovery because of its failure to perfect the necessary appeal within 30 days as required by Article 11 of the contract. Defendant further contends that apart from the failure of timely appeals, the decision here must be for the Government on the grounds that the decision of the War Department Board of Contract Appeals, which ruled adversely to plaintiff on the merits of its claims, is final and binding on this court. That decision, defendant points out, is fully supported by the evidence and no showing has been made of wrongdoing on the part of defendant's representatives.

■ The Board of Contract Appeals granted plaintiff a full hearing on the merits of its claims because it deemed a consideration on the merits necessary to a decision on the jurisdictional question presented, that is, whether a timely appeal had been made. The Board then, in addition to dismissing the appeal for failure to perfect it within the required time, made and incorporated as part of its decision, detailed findings of fact which were adverse to plaintiff on all its claims. While the decision of the head of the department as to the facts is binding on this court under United States v. Wunderlich, 342 U.S. 98, 72 S.

Ct. 154, 96 L.Ed. 113, its decision as to whether a timely appeal has been perfected within the meaning of the contract, being a question of law, is not one to which the limitation of Wunderlich attaches. W. C. Shepherd v. United States, 1953, 113 F.Supp. 648, 125 Ct. Cl. 724, 729; See W. E. Callahan Construction Co. v. United States, 91 Ct.Cl. 538, 616.

Thus, we have in effect a twofold decision by the Board, part of which is binding here and part which is not. We will first consider the issue of timely appeal.

Plaintiff in an effort to void any effect which the adverse Board ruling may have argues that since it was never presented with formal findings of fact by the contracting officer there never was in existence a decision which was appealable; thus, even to this time, the period time within which it was required to appeal has never begun to run. In so contending, plaintiff refuses to accept the written "notices of terminations" and the reasons given therefor by the contracting officer, as being sufficient notice of the contracting officer's decisions. The essence of these notices was that the terminations were made because of plaintiff's failure to meet the required delivery dates.

Defendant meets this contention with reliance on Kilgore v. United States, 121 Ct.Cl. 340, 371–372. However, that case as well as Climatic Rainwear Co., Inc., v. United States, 88 F.Supp. 415, 115 Ct. Cl. 520, 559, relied on by plaintiff is inapplicable here since the Government in terminating contracts in both those cases acted under contract provisions materially different from those present in the instant case.[4]

The contracting officer made the terminations under Article 10, supra, and

---

4. In the Kilgore case the applicable provision, Standard Article 9, read in part as follows: "*Provided*, That the right of the contractor to proceed shall not be terminated * * * if the contractor shall within 10 days from the beginning of any such delay * * * notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the *findings of fact* justify such an extention, and his *findings of fact* thereon shall be final

the plaintiff's right to contest those terminations is to be found in the "Disputes" clause, Article 11, supra. This latter article requires only that the contracting officer "reduce his decision to writing and mail a copy thereof to the Contractor."

In addition to the notices of termination received by plaintiff, the contracting officer during August and September of 1943, in answer to protests by plaintiff, wrote on two occasions making it entirely clear why the partial terminations were made and why plaintiff's alleged excuses for the delays were being rejected. Even after receipt of these letters plaintiff made no appeal. Instead, at its request, further negotiations were initiated with the Office of the Quartermaster General in Washington and with personnel at the Jeffersonville Depot, which resulted in a revision of the contract. Finding 25.

Universal Power Corp. v. United States, 112 Ct.Cl. 97, cited by plaintiff as supporting its contentions is in point insofar as it involved the termination of a contract under provisions identical with Articles 10 and 11 here. However, we ruled in that case that the contracting officer was in error not merely because he failed to furnish findings of fact, but that he had failed to take any notice whatsoever of protests by the contractor, and as a result he neglected even so much as to notify the contractor as to what, he, the contracting officer found to be the causes of the delay in question. Here the plaintiff was placed on adequate notice as to what the contracting officer believed to be the cause of the delays, and that such cause was not excusable under the contract.

■ We hold, therefore, that the "notices of terminations" and the letters of August and September 1943 constituted sufficient notice to the plaintiff of the contracting officer's decisions, under the contract provisions applicable here, and because of the failure to appeal those de-

cisions within the thirty days as required by Article 11, plaintiff is barred from recovery. United States v. Blair, 321 U. S. 730, 735, 64 S.Ct. 820, 88 L.Ed. 1039; United States v. Joseph A. Holpuch Co., 328 U.S. 234, 240, 66 S.Ct. 1000, 90 L. Ed. 1192.

■ The consideration of plaintiff's claims on the merits leads to the identical conclusion. As mentioned above, the findings of fact made by the Board of Contract Appeals are binding here. The findings of the Board are supported by the evidence, and there is no evidence of the factors which would free those findings from the force which Wunderlich gives to them. Finding 38. Therefore, any discussion of plaintiff's case on its merits must begin with the recognition that the sole and primary cause of plaintiff's delay was the failure of its subcontractor to furnish satisfactory dies which default was due to that company's inability -to produce the dies. However, the Board's conclusion that this was not an excusable delay under the contract is not binding because it rests upon a construction of the contract.

Article 10, under which the partial termination actions were taken, provides in part as follows:

"* * * The right of the Contractor to proceed with the performance of this contract shall not be terminated * * * *if the delay is due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor * *.*"
[Italics supplied.]

Plaintiff's position is that the delay caused by the subcontractor's failure to produce adequate dies due to its inexperience was an unforeseeable cause within the above article, and that the failure of the contracting officer to grant time extensions for the resulting delay was a breach of contract on behalf of the Government.

Defendant meets this contention with the opposite argument, asserting that the

and conclusive * * * subject only to appeal, within 30 days * * * to the head of the department." [Italics supplied.] This language is substantially

the same as that which appears in the Article 26 provision found in the Climatic Rainwear case.

inability of the subcontractor to perform was not excusable. This is particularly so, defendant urges, when it is remembered that the process for making stainless steel canteens was comparatively new, and what progress had been made had been done so only with difficulty.

Plaintiff relies primarily on two cases, H. B. Nelson Construction Co. v. United States, 87 Ct.Cl. 375, and Climatic Rainwear Co., Inc., v. United States, supra, as supporting its position. In the Nelson case delay resulted when some of the contractor's materials were delivered in a damaged condition due to the negligence of the railroad in transporting them. That delay was held to have been an unforeseeable one not chargeable to the contractor since prompt and satisfactory service on the part of the railroads was to be expected, and the contractor in binding himself to specified completion dates was entitled to rely on it. In the Climatic Rainwear case, plaintiff manufactured raincoats for the War Department, and delay resulted when a number of the finished coats were rejected because of leakage at the seams. The samples had originally been approved as satisfactory, but after delivery had begun on a large scale, this defect was discovered. It was remedied by the use of different strapping material at the seams but only after extensive tests by all parties concerned. Citing the Nelson case, we held that the failure of the strapping material to be watertight after it had been previously tested and found to be acceptable by the Government was an unforeseeable cause beyond the control and without fault by the contractor. Neither case can be controlling here since difficulties in manufacturing stainless steel canteens was to be expected, and plaintiff was expressly and clearly put on notice of such difficulties when it bound itself to deliver on the dates called for in the contract. The difficulty which ensued can hardly be said to have been unforeseeable when it is recalled that the plaintiff obligated itself to embark upon work new to it, with no dies with which to fabricate the canteens and possessed of no facilities to produce those dies, thus necessitating its looking elsewhere for that basic equipment. See Lebanon Woolen Mills, Inc., v. United States, 99 Ct.Cl. 318, 328.

Nor does the inexperience of the subcontractor operate to excuse plaintiff's delays. Under a contract such as we have here, lack of "know-how" is no excuse for failure of performance. Carnegie Steel Co. v. United States, 240 U. S. 156, 36 S.Ct. 342, 60 L.Ed. 576.

■ There remains one point more, and that deals with the plaintiff's contention which runs throughout its brief to the effect that there existed from the very beginning, on the part of the Quartermaster personnel, a concerted effort to remove this contract from the plaintiff. This, plaintiff asserts, was tantamount to fraud on the part of defendant's representatives. It is not disputed that the Office of the Quartermaster General in Washington was displeased with the award of this contract. But the facts support their position. The Depot at Jeffersonville had evidently been prompted to let this contract to plaintiff because of the activities of the Smaller War Plants Corporation in Washington, whose efforts were directed at obtaining war contracts for the smaller plants, and at the same time provide for greater diversification of war contracts. The process of fabricating canteens from stainless steel was a comparatively new process and, at the time of this award to plaintiff, only two firms had been able to solve adequately all difficulties encountered. Finding 5. The Quartermaster officers in Washington realizing time was of the essence in securing delivery of the canteens believed that the experienced firms should receive the bulk of the canteen contracts. As it developed, their fears in connection with plaintiff's contract proved to be well grounded. Plaintiff's officers were warned from the very beginning that failure to meet delivery dates would result in termination action. Finding 5. Plaintiff was afforded the opportunity to withdraw from its bid but declined. Thus, the Government determined that it would adhere strictly to the delivery

596

date requirements which its officers did, but not to the extent of defrauding plaintiff of its right to proceed under the contract. We find no substantial evidence supporting plaintiff's assertions to the effect that the contracting officer acted under the compulsion of higher authority in terminating portions of the contract rather than on the merits of the situation. The absence of any such intent on the part of Quartermaster personnel is evidenced by the several revisions which they permitted to be made in the contract in order that plaintiff could, even in the face of its inexcusable difficulties, deliver portions of the contract quantity. We think the Government was fair to plaintiff in every way.

In conclusion, we hold that plaintiff is not entitled to recover because it failed to perfect a timely appeal as required by the contract, and even apart from that bar, plaintiff is precluded on the facts since it must be held that the delays incurred were chargeable to it, thus entitling the defendant to terminate the contract as it did. Plaintiff's petition is dismissed. It is so ordered.

JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.