FRANKLIN E. PENNY CO.

v.

The UNITED STATES.

No. 433–73.

United States Court of Claims.

Oct. 22, 1975.

Frederick D. Sarkis, Bryn Mawr, Pa., attorney of record, for plaintiff.

Alan L. Ferber, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, for defendant.

Before COWEN, Chief Judge, and DAVIS and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's motion, filed June 12, 1975, pursuant to Rule 141(b) [but deemed to have been filed under Rule 54(b)(3)(iii)], requesting that the court adopt the recommenced decision of Trial Judge John P. Wiese *, filed April 28, 1975, pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment, since plaintiff has failed to file a timely request for review by the court of the trial judge's recommended decision. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, plaintiff's petition is dismissed and judgment is entered for defendant on its counterclaims against plaintiff in the sum of $58,992.94.

## OPINION OF TRIAL JUDGE

### WIESE, Trial Judge:

This is an appeal from a decision of the Armed Services Board of Contract Appeals (hereinafter the Board) sustaining the Government's default termination of plaintiff's supply contract.[1] The appeal, presented here in the conventional format of a motion for summary judgment, asserts that the administrative decision is not entitled to finality under the

---

* The necessary facts are stated in the opinion.

1. *Franklin E. Penny Co.*, ASBCA No. 15229, 71–2 BCA ¶ 9159 [hereinafter cited as 71–2 BCA].

Wunderlich Act[2] first, because it reflects alleged errors of law and second, because it includes factual findings that are said to be lacking in substantial evidentiary support. The United States denies these claimed deficiencies in the Board's decision and insists that the decision is entitled to full finality. In addition, the United States has interposed, by way of counterclaims, a demand for judgment in the amount of $58,992.94. This demand represents the aggregate of excess reprocurement costs that were incurred by the United States in consequence of its reletting of 14 separate contracts upon each of which plaintiff had been default terminated.

Upon a review of the record and notwithstanding some equities in its favor, the conclusion must be reached that plaintiff cannot prevail. The administrative decision is entitled to full finality and the United States is entitled to judgment on its counterclaims.

## I. The Essential Facts[3]

On May 8, 1969, the United States, acting through the Navy Ships Parts Control Center in Mechanicsburg, Pennsylvania, issued a small business set-aside solicitation seeking bids for the manufacture of 96 shock mounts for Terrier missile containers. The shock mounts, which were to be fabricated in accordance with the specifications contained in a 1965 drawing, included a subassembly that required the bonding of rubber blocks to metal plates. Relevant to this bonding requirement was a recitation on the drawing which stated as follows:

The following manufacturers are approved for the bonding of the metal parts to the rubber.

1. Lord Manufacturing Company, Erie, Pa.

2. Dow-Elco Inc., Montebello, California

3. Henrite Products Corporation, Ironton, Ohio

4. Goodyear Tire and Rubber Company

Other manufacturers wishing to bond the rubber parts shall contact the Navy Bureau of Ordnance, Washington, D. C. for approval. [ASBCA Record, Appellant's Exhibit A–1, Contract Drawing, Shock Mount Sub-Assembly.]

Upon receipt of this solicitation, the contractor contacted various potential suppliers to ascertain prices and delivery times. Among the companies thus contacted was the Lord Manufacturing Company, the first of the four companies that had been listed on the contract drawing as a Navy-approved source of supply for the bonding requirement. This initial contract with the Lord Manufacturing Company was by way of a telephone call between plaintiff's president and a Lord salesman and, in the course of their telephone conversation, plaintiff was informed that the company had often done the bonding operation in the past. At the time, plaintiff asked for and was given a bonding quote of $12 per unit. However, it does not appear from the testimony that anything more than this was ascertained, that is, the question of delivery was not discussed. On this same point, the Board found "that the latter [meaning plaintiff's president] made no direct inquiry as to whether and within what time frame Lord Manufacturing Company was willing to undertake the bonding job and that he considered the salesman's willingness to quote a price as implying willingness on Lord's part to perform the work when given a definite order * * *."[4]

Following this telephone conversation and being then otherwise satisfied that it could properly accomplish the work,

2. 68 Stat. 81, 41 U.S.C. §§ 321–22 (1970).

3. Unless otherwise indicated, the facts given are drawn from those found by the Board or else represent uncontroverted facts.

4. 71–2 BCA at 42,478.

the contractor submitted a bid and was awarded the contract in the latter part of June 1969. Under its terms full performance was due within 90 days from the award, or, in this instance, by September 15, 1969. The total amount of the contract was $33,600.

Approximately one month after the contract award, the contractor forwarded a purchase order to Lord Manufacturing Company asking that it undertake to do the bonding work that the contract required. Within a week thereafter, on July 30, 1969, Lord Manufacturing responded saying that it was not then tooled to produce the item and would therefore not be competitive; hence, the order was declined. Thereupon, the contractor turned to the other Navy-approved suppliers and learned through the inquiries that followed that of the three remaining listed companies, two—Henrite Products Corporation and Dow-Elco Inc.—were no longer in business, while the third, Goodyear Tire and Rubber Company, was not interested in the work because the job was too small and the delivery time too short. Other companies were then sought out but without timely success.

Because of this difficulty, the contractor found it necessary to request a time extension. On September 4, 1969, plaintiff's president addressed a letter to the Defense Contract Administrative Services Region (DCASR), Philadelphia, Pennsylvania, which asked for an extension of the contract's delivery date to December 15, 1969. This request was granted. In the letter asking for the extension, no mention was made of the bonding problem. Instead, the contractor referred to his problems as "machining difficulties." In his testimony before the Board, the contractor explained that use of the term "machining difficulties" had been suggested to him by a DCASR

employee whose function it was to monitor the status of the contractor's production and who, in the pursuance of these duties, visited the contractor's plant on a weekly basis and was thus aware of the problem that had been encountered with respect to locating a subcontractor for the bonding work.

The effort to locate a satisfactory bonding source was continued. Although the Board made no finding on the point, it appears that of the numerous companies that were contacted during this extension period, those that did express an interest in doing the bonding work demanded more lead time than plaintiff felt could be allowed. At any rate, it was not until the end of November or early December that plaintiff located an acceptable bonding subcontractor. This company, the Alpha Rubber Company, advised plaintiff that it would need about 5 weeks in which to make the necessary mold and from this to produce the necessary parts.

On January 8, 1970, plaintiff again wrote DCASR to request extension of the contract's delivery date—this time until February 1, 1970.[5] Machining difficulties were once more cited as the reason for the requested extension and again plaintiff explained that his use of this reason for extension was prompted by the suggestions made to him by the DCASR representative.

Alpha's initially projected 5-week delivery period did not materialize. That company experienced problems in the making of the mold and this, in turn, made impossible plaintiff's completed performance by the anticipated date of February 1, 1970.

Accordingly, on February 3, 1970, plaintiff forwarded a third request for extension to DCASR. In this letter, plaintiff for the first time mentioned

---

**5.** The record offers no explanation, by way of testimony or otherwise, concerning the period between December 15, 1969—the terminal date of the contract under the first extension—and January 8, 1970, the date the contractor wrote to request his second time extension. Presumably, this hiatus was a period of inactivity for both parties. The Government seems not to have raised any questions regarding the contractor's tardiness in performance and the contractor, in turn, took no timely steps to secure a necessary second extension.

that it was "having difficulty in obtaining delivery of the rubber bonding on parts for this contract * * *." An extension until March 1, 1970, was requested.

On February 19, 1970, the Government responded to the contractor's two pending requests for additional time. (The January request had not previously been acted upon by the Government.) On this date, it issued amendment 2 to the contract extending the contract's delivery date from the then existing but obviously no longer controlling due date of December 15, 1969, to the most recently requested date that had been specified by the contractor, namely, March 1, 1970.

The contractor did not perform by the promised date of March 1, 1970. Accordingly, on March 2, 1970, the contracting officer wrote to advise plaintiff that, if delivery had not been made in accordance with the March 1, 1970 date, then the contract would be carried in a delinquent status until March 12, 1970. At the same time, the contractor was asked to present in writing, within 10 days, any reasons that might establish that the failure to perform had been due to reasons beyond the contractor's control and without his fault or negligence.

The contractor responded on March 7, 1970. The answer given the Government reads, in part, as follows:

> When we first quoted this job there were three names of companies given who were qualified to do the rubber bonding on this job. I got a price to quote from one of them on the telephone. After I received the contract I found that one of the companies named on the print was out of business and the other two felt that the job was too small to bother with.
>
> The problem is that we had difficulty finding someone who would agree

to do the bonding. After we found a company to do the bonding we were held up on the molds for 12 weeks before the bonding could begin. [ASBCA Record, Rule 4 Doc. No. 5.]

The letter goes on to recite that, but for the problem with the molds, delivery would have been accomplished sometime in January and that "[a]s of now the bonding is being done and we will ship this job by the end of March." The contracting officer did not consider the contractor's response to be sufficient to preclude termination for default; by letter of March 20, 1970, the contract was so terminated.

## II. Discussion

A. *Plaintiff's Claim:* In its decision the Board said that in order for the contractor to escape the consequences of a default termination it would have to be shown that the failure to deliver had been due to causes beyond the control and without the fault or negligence of itself or its subcontractor. In the Board's view of the case this burden had not been met. The cause of the default, as the Board saw it, was the subcontractor's delay, and as to this cause it was observed that "the record contains neither detailed explanation of its [the subcontractor's] delay nor a showing that it was due to any cause other than Alpha's technical inability to complete the work on time."[6] Such a cause, said the Board, "is one for which both appellant and its subcontractor must take responsibility."[7]

■ The Board was correct both in its view of the law as well as in its application to the facts of the case. The default clause in plaintiff's supply contract[8] gave the Government the right

**6.** 71–2 BCA at 42,480.

**7.** *Id.*

**8.** The Default Clause in the contract reads in part as follows:

"(a) The Government may, subject to the provisions of paragraph (c) below, by written

notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

"(i) If the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

to terminate the contract either in whole or in part if the contractor failed to make delivery of the supplies within the time specified in the contract or any extension thereof. The existence of "excusable" causes for delay or nondelivery would, of course, require converting a default termination into a termination for the Government's convenience (see paragraph (e) of the "Default" clause, *supra* note 8). However subcontractor delays of the sort experienced here do not excuse a prime contractor's delinquencies. *See Poloron Products, Inc. v. United States,* 116 F.Supp. 588, 595, 126 Ct.Cl. 816, 828 (1953), and *Putnam Mills Corp.,* ASBCA No. 5548, 60–1 BCA ¶ 2511. Indeed, plaintiff does not challenge the Board's decision on this ground. Instead, the arguments that are raised look not to excuse the contractor's delivery failure; rather, they seek to place the responsibility for the default squarely upon the Government's shoulders.

Chief among the contentions that are made in this regard is the argument that where a solicitation enumerates, as the one here involved did, the names of Government-approved manufacturing sources, then such enumeration is, in effect, a representation by the Government that the named sources are ready, willing and able to do the work contemplated by the contract and to accomplish the same within the required time frame. Thus, the argument continues, when such representations prove to be wrong, as was said to have been the case here and the Government, at the same time, fails to allow the contractor sufficient time to qualify a new source of supply, then, under these circumstances, it is the Government that stands in breach of the contract and the contractor is exonerated from any responsibilities flowing from his failure to deliver.

■ The argument that is made has validity—but only to a limited extent and that to a degree insufficient to carry the day for plaintiff. Where the Government issues a contract drawing upon which are listed the names of Government-approved sources of supply, one could readily accept the proposition that such a listing constitutes a representation, *i. e.,* a warranty by the Government, that the listed suppliers have the *ability* to do the work contemplated by the contract. Indeed, the com-

"(ii) If the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

\* \* \* \* \* \*

"(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor.
\* \* \*

\* \* \* \* \* \*

"(e) If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause. If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, and if this contract does not contain a clause providing for termination for convenience of the Government, the contract shall be equitably adjusted to compensate for such termination and the contract modified accordingly; failure to agree to any such adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled 'Disputes'."

mon sense of the situation could tolerate no less a construction of such contract statements. But it is quite another matter to say, as plaintiff also does, that in addition to guaranteeing the abilities of the listed manufacturers to perform, the Government is also warranting their willingness to do so and within the time period contemplated by the contract.

In *Paccon, Inc. v. United States,* 399 F.2d 162, 168, 185 Ct.Cl. 24, 33 (1968), the court expressed the general rule that a warranty which would place upon the shoulders of the United States the burden of guaranteeing the performance of third parties without regard to any fault of its own is an unusual assumption of responsibility and one that "should not be inferred from ambiguous, inconclusive, or general discussions." The admonition declared in *Paccon* fits this situation even more convincingly. The contract language used here (previously quoted herein at p. 671) simply does not lend itself to the interpretation that plaintiff urges nor are there any attendant circumstances detailed in the proof from which the equivalent implication might justifiably be drawn. Fairly construed, the language that was used in the contract drawing promises only that those named can do the job; not that they will. Moreover, it would be highly unusual, to say the least, to conclude that the United States, having once approved a given supplier's technical qualifications, should thereafter be considered as having placed itself in the position of guaranteeing that supplier's willingness to undertake the work whenever a demand for the service might materialize. The realities of business life absolutely negate any such assumptions. In short, it would be nothing less than arbitrary to endorse the interpretation plaintiff espouses. On this record, no breach of contract may be imputed to the United States simply because the manufacturers that it had listed as approved sources of supply declined to undertake the work for which they had been found qualified.

■ Given the conclusion stated it must follow that the obligation to locate a supplier remains where that sort of obligation has traditionally rested—upon the contractor. Of course, in the circumstances detailed here, where the Government has specified that the metal-to-rubber bonding work may only be done by an approved source and where all the approved sources are found to be unavailable, the contractor would be entitled to time extensions sufficient to permit the locating of a new supplier and the securing of the Government's necessary approval. And it is precisely this point—the matter of sufficient time—which is the focus of the second part of plaintiff's chief argument.

The contention is made that since Government approval of the bonding manufacturer was not only a contract requirement but also an unavoidable prerequisite in this case (because of the unavailability of all previously approved manufacturers), then the termination of the contract before the contractor was in a position to submit work for approval was plainly a breach of contract.

■ This contention cannot be accepted. The argument completely overlooks the fact that the contract termination, though indeed effected before approval had been accomplished, occurred after plaintiff had failed to meet the delivery date that had been promised. To ignore this critical fact is, in essence, to say that the Government's contract reservation of a right of approval carries with it the correlative duty to hold open a contract without regard to all intervening delays until such time as the contractor is in a position to tender a product for approval. Clearly, there is no such obligation. On the contrary, contractor-caused delays in timely submitting a product for approval expose the situation to the same risks of termination as would attend the failure to make timely deliveries once approval had been given. In either case, the sufficiency of the contractor's performance is to be measured by the dates specified in the contract; where delinquencies occur which are not excusable, then termination for default is within the Government's rights.

■ To be sure, the rule would be otherwise if the delays resulted from circumstances with respect to which the Governmemt bore the risk. Thus, for example, if it had been the case here that the Government had selected the subcontractor or had vouched for the competence of the one that was selected, then delays attributable to that subcontractor's technical problems (in doing the work) would remain within the Government's sphere of responsibility. However, neither of these conditions were met here. The subcontractor whose delays ultimately brought about plaintiff's default was chosen by plaintiff alone. In short, in this situation the attendant risks remain with the plaintiff.

According to the contract's terms, if the subcontractor is the source of delay, then the prime contractor may be excused only if the reasons for the delay are beyond the control and without the fault or negligence of either the contractor or its subcontractor. Manifestly, that was not shown to be the case here. The record is virtually barren of any pertinent information on this score. Nothing more appears save the fact that the subcontractor had experienced some technical problems in doing the work. There is no account either of the nature of these problems nor the reasons for them. Such being the state of the proof and given the rejection here of plaintiff's "warranty" argument, it must follow that termination before approval had been given was not erroneous.

A second argument that is raised against the correctness of the default termination is the contention that the termination was improper because it occurred at a point when plaintiff had substantially performed the contract.

■■ Substantial performance, as that term is used here, refers to the equitable doctrine that guards against forfeiture in situations where a party's contract performance departs in minor respects from that which had been promised. Building and construction contracts offer the most frequent examples of its application though clearly the doc-

trine has its place in contracts for supplies as well. *See, e. g., Radiation Technology, Inc. v. United States,* 366 F.2d 1003, 177 Ct.Cl. 227 (1966), and *LeRoy Dyal Co. v. Allen,* 161 F.2d 152 (4th Cir. 1947).

In resisting the application of the substantial performance doctrine to the facts of this case, the Government makes the argument that that doctrine can have application in a supply contract situation only if the contractor has delivered the goods on schedule. In other words, for the Government, the matter of the substantiality of a contractor's performance is limited simply to the question of the conformity of delivered supplies.

■ Surely this is too narrow a view to endorse, at least for a contract of the sort here involved. It has long been the rule that, save in situations where "time is of the essence," the timeliness of a contractor's performance is as much a factor to be considered in evaluating the substantiality of that performance as are all other factors which might bear upon the adequacy of completeness of that performance. 3 A. Corbin, Contracts § 713 (1960). In an early case, *Beck & Pauli Lithographing Co. v. Colorado Milling & Elevator Co.,* 52 F. 700, 703 (8th Cir. 1892), it was said that "in contracts for work or skill, and the materials upon which it is to be bestowed, a statement fixing the time of performance of the contract is not ordinarily of its essence, and a failure to perform within the time stipulated, followed by substantial performance after a short delay, will not justify the aggrieved party in repudiating the entire contract * * *." Essentially the same view applies today. *See* Restatement (Second) of Law, Contracts 2d § 255, Comment *c* at 598–99 (Tent. Drafts Nos. 1–7, 1973).

■ But notwithstanding the application of a different or more liberal rule than that being urged by the Government, the conclusion must nevertheless be reached that the substantial performance doctrine is inapplicable here. It is

enough to defeat plaintiff's position to point out that, as of March 2, 1970 (the date the contracting officer wrote to inquire concerning the state of performance), the contractor's then estimated time to completion involved a requirement for approximately 30 additional days. Whether this additional required time be viewed in the context of the delivery period which the Government had initially contemplated, namely 90 days, or whether it be measured against the sum of the extensions that it had thrice granted the contractor, amounting in all to about 160 days, in neither context would a further delay of 30 days be excusable in the sense that the contractor had substantially complied with the delivery schedule. Moreover, to the additional time which the contractor had projected, there would have to be added also whatever additional testing time the Government might require in order to assure itself that the product, as offered, met the contract requirements. Thus, in net result, the delays would extend even beyond the contractor's own time estimate.

■■■■ Admittedly, the purpose of the substantial performance doctrine is to avoid the harshness of a forfeiture. By the same token, however, the doctrine should not be carried to the point where the non-defaulting party is compelled to accept a measure of performance fundamentally less than had been bargained for. Substantial performance "is never properly invoked unless the promisee has obtained to all intents and purposes all benefits which he reasonably anticipated receiving under the contract." *In Re Kinney Aluminum Co.*, 78 F.Supp. 565, 568 (S.D.Cal.1948). Given this stated restriction, it would have to be concluded that the extent of the further delay that was anticipated by the contractor goes beyond what the Government could justifiably be required to accept in the name of substantial performance.

■■■■ The foregoing is not meant to suggest that every delay that might be judged to be extensive when viewed against the time requirements of the contract as a whole is, by itself, sufficient to preclude a finding of substantial performance. To the contrary, there might well be situations where performance has been brought to a point sufficient to permit the Government the satisfactory use of the product and thereafter a delay occurs with respect to a remaining minor item of work that has the effect of making 100 percent completion impossible for a period of time. Under these circumstances a delay even longer than that experienced here would not preclude a finding that substantial performance had taken place. So long as the product in its then existing condition could be put to satisfactory use by the Government, then substantial performance has been achieved. However, there is nothing in this record that would permit the conclusion that such was the state of affairs here when the contract was terminated. No more may be inferred in this situation save that performance involving substantial value had taken place. But that is not substantial performance.

■■■■ There is a third argument made which is to the effect that it was error for the Board to have accepted the validity of the contract's delivery schedule because, according to plaintiff, that schedule reflected contractor-requested time extensions that had been induced by Government coercion, by threats to terminate the contract and by false representation.

There is absolutely no support for these contentions. All that the record reveals is that, with respect to the first two extensions that were sought, plaintiff relied upon the DCASR representative's advice to cite "machining difficulties" as the reason for needing more time. As to this reason, certainly a more accurate description of plaintiff's then-current problems might have been given. However, it is by no means made clear how the use of this suggested reason, in lieu of some other, operated to plaintiff's detriment in any way. The fact of the matter is that the initial two extensions

that were requested by plaintiff were granted, that a later extension specifically requested because of bonding problems was likewise granted and that, with respect to all three time extensions, the amount of time that was asked for in each reflected plaintiff's own expected delivery estimations. There is not the remotest proof in this record of any Government coercion or misdealing with plaintiff sufficient to invalidate the enforceability of the contract's delivery schedule.

■■ A final argument that is raised makes the point that, in sustaining the default termination, the Board entirely overlooked the Government's legal obligations to assist contractors participating in small business set-aside procurements. No citations of authority are offered in support of this point, though clearly the court's rules demand this. See Rule 163(b)(3)(ii).

■■ It is the function of the attorney and not that of the court to point out errors with specificity; this rule is the same whether the error claimed is one of fact, see *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1248, 192 Ct.Cl. 649, 661 (1970), or of law, see *Ala Moana Boat Owners' Ass'n v. State*, 50 Haw. 156, 434 P.2d 516, 518 (Hawaii 1967). Since the proposition claimed by plaintiff is not one so generally understood as to require no supporting citation, no more need be said on the point raised save that plaintiff has not sustained its burden of showing that the Board was wrong in doing what it did.

With respect to the factual side of the case, there are a number of findings that are challenged for a claimed lack of substantial evidence. However, there is no need to take up these challenged findings individually for even if plaintiff were found to be right in some or all particulars the outcome would yet remain the same. On the few critical points in this case, the evidence is not equivocal or subject to debate: there was no warranty by the Government with respect to the availability of the

suppliers that it had listed on the contract drawing; the default that occurred here was caused by a subcontractor selected by plaintiff and that default was ascertained by an assessment of performance that had been measured against a delivery schedule that had been established by plaintiff. Since none of the facts which plaintiff challenges would alter these basic points in any way, all further consideration of the challenged facts is irrelevant.

It follows from the foregoing discussions that the Board's decision must be recognized to be the final decision in the matter.

B. *The Government's Counterclaims:* In this case the Government has filed a number of counterclaims (14 in all) which collectively represent a demand for judgment in the amount of $58,-992.94. The counterclaims reflect the excess reprocurement costs that were incurred by the United States in consequence of its having to purchase, on the open market, supplies that plaintiff had contracted for but failed to deliver. The counterclaims assert that, in each instance, the failure to deliver was followed by a default termination and a final decision of the contracting officer which was not thereafter appealed by plaintiff to the Armed Services Board of Contract Appeals. Further, it is stated that timely demand for payment was made upon plaintiff by the procuring agency (the Department of the Navy) and also by the General Accounting Office and that no response was given by plaintiff to either of these demands. Copies of the final decisions that were written by the contracting officers involved in these 14 procurements, together with the tabulation of excess costs that accompanied the transmittal of each of these final decisions to plaintiff are set out as Defendant's Exhibits 1–14 in the Appendix to Defendant's Cross-Motion for Summary Judgment.

To the above-described demand for judgment, plaintiff has answered as follows: first, it denies the allegations of

the counterclaims "except to the extent that they are supported by the administrative record;" second, it asserts that there has been and is now in effect a bona fide assignment made under the Federal Assignment of Claims Act[9] pursuant to which any proceeds generated under the contract in issue (*i. e.,* the contract upon which the instant Wunderlich Act Review was sought) are to be paid over to the designated assignee, in this case, the First National Bank of West Chester, Pennsylvania. The existence of this assignment, says the plaintiff, bars the United States from interposing any counterclaim or set-off in this case.

■ The arguments which plaintiff offers are not sufficient to defeat the counterclaim demands of the Government. As to the first defense asserted, it is of no consequence that the counterclaims relate to transactions that were not part of the administrative record that had been made before the Board in this case. Under 28 U.S.C. § 1503 (1970), the Court of Claims has jurisdiction "to render judgment upon any set-off or demand by the United States against any plaintiff in such court" and pursuant to Rule 40(b) of the court's rules, the United States "may state as a counterclaim [in its answer] any claim against a plaintiff not arising out of the transaction or occurrence that is the subject matter of the petition." In this instance the counterclaim demands of the United States relate to transactions totally independent of the subject matter of the disputes proceeding that plaintiff commenced before the Armed Services Board of Contract Appeals; those demands are properly raised here for the first time.

■ With respect to the second defense raised, this too falls wide of the mark. Assuming the existence of the assignment claimed by plaintiff, then any recovery of the contract proceeds covered by that assignment would, of course, be afforded statutory protection against reduction or set-off on account of transactions arising independent therefrom. 31 U.S.C. § 203, 41 U.S.C. § 15. However, this protection against a diminution in contract proceeds is a limited benefit and one that runs exclusively to the assignee. By no means could it be extended to bar the United States from obtaining a judgment, in an amount *independent* of what might otherwise be found owing the assignee, that runs exclusively against the plaintiff and that is based upon transactions unrelated to the cause of action sued on. In other words, while contract sums earmarked for an assignee are not subject to set-off or reduction on account of unrelated transactions, nevertheless, a plaintiff who sues to recover such sums in behalf of the assignee is properly subject to counterclaim demands that arise from unrelated transactions. *See Scott v. United States,* 354 F.2d 292, 173 Ct.Cl. 650 (1965).

Save for the two points above discussed, nothing else is said by plaintiff by way of challenging the Government's counterclaims. Thus, on the record as it now stands, the Government is entitled to the relief that it seeks. The facts it has alleged are fully supported by the documentation that was provided, namely, copies of each of the contracting officer's final decisions with each showing a transmittal to plaintiff by way of certified mail, return receipt requested; this same documentation also contains the computation showing the manner in which the excess procurement costs were calculated and the amounts thereof. In short, the proof, though limited, is sufficient to sustain the entry of judgment against plaintiff on the Government's counterclaims in the amount of $58,-992.94.

## CONCLUSION

For the reasons given herein (i) plaintiff's motion for summary judgment is denied and its petition is dismissed; (ii) the Government's cross-motion for sum-

---

**9.** The Assignment of Claims Act of 1940, 31 U.S.C. § 203, 41 U.S.C. § 15 (1970).

mary judgment is granted; and (iii) judgment is entered for the Government on its counterclaims in the amount of $58,992.94.